PHILLIPS *v.* JONES.

Opinion delivered June 24, 1929.

878

J. J. Montgomery and Jesse Reynolds, for appellant.

G. O. Patterson, A. S. Hays, Hugh Basham and W. L. Cunningham, for appellee.

BUTLER, J.   The suit involves the contest of the last will and testament of Henry W. Jones, deceased, who left surviving him three children by a former marriage and a widow who had been married before her marriage to Jones, and who, at that time, was the mother of a number of children.   Jones executed his will in 1916, by which he gave to his wife all of his property for her life, and at her death to her children, the stepchildren of Jones, and his own children were bequeathed the sum of $5 each. The will was contested by the deceased's children, Robert Jones, Charlie Jones and Rhoda Burkett, on the ground of lack of testamentary capacity and undue influence. There were no children born to the testator by his second marriage.

In the circuit court the case was submitted to the judge sitting as a jury, who, after having heard the testimony, found against the will, and it is to review his decision that this appeal has been prosecuted.

The judge, in trying the case, necessarily considered the question of testamentary capacity and undue influence together, and this court is concluded by his finding, if there was any substantial evidence adduced which

would tend to establish and sustain his finding and judgment. In determining the sufficiency of the evidence this court must give to the evidence heard by the court tending to establish the correctness of his finding its strongest probative force and value. This rule is so well settled that we deem it unnecessary to cite the authorities sustaining this view.

As we have said, the questions of testamentary capacity and undue influence are so interwoven in any case where these questions are raised that the court necessarily considered them together (*St. Joseph's Convent* v. *Garner*, 66 Ark. 623, 53 S. W. 298), for in one case where the mind of the testator is strong and alert the facts constituting the undue influence would be required to be far stronger in their tendency to influence the mind unduly than in another, where the mind of the testator was impaired, either by some inherent defect or by the consequences of disease or advancing age. It is clear that feeble intellect will not be of itself sufficient to establish lack of testamentary capacity, for that condition must be so great as to render the testator incapable of appreciating the nature and consequences of his act; but this feebleness may be inferred when, from the facts in proof, it is apparent that he was incapable of appreciating the deserts and relations of those whom he excludes from participating in his estate, although he might have had the ability to retain in memory, without prompting, the extent and condition of his property, and to comprehend to whom he was giving it. *Taylor* v. *McClintock*, 87 Ark. 243, 112 S. W. 405; *Mason* v. *Bowen*, 122 Ark. 407, 183 S. W. 973, Ann. Cas. 1917B, 713.

The facts constituting undue influence largely depend upon the condition of the mind of the person alleged to have been influenced. It has been said in the case of *Kelly's Heirs* v. *McGuire*, 15 Ark. 555, that if one is of such great weakness of mind as to be unable to resist importunity, and his act is not that of a judgment deliberately exercised, but the result of the control of a

stronger mind by any means or artifice, cunning or fraud, that act is void.

The court, in discussing what would amount to undue influence, associates the state of mind with the causes operating upon it to induce the commission of an act. In the case of *Tobin* v. *Jenkins*, 29 Ark. 157, where the question before the court was whether or not the testator was of disposing mind and memory to make the will, and, if he was, was he also at the same time free to act, this language was used:

"Free agency and capacity to contract are each indispensably necessary to make a valid contract or execute a valid will. The lack of mind comprehends both, because without mind there can be no free agency; but if there is mind it must be free to act, and if restrained unduly to the extent that free agency is destroyed, the act is void. This incapacity, or undue restraint, must exist at the time the act is done; if capacity and free agency exist then, the act is valid, irrespective of the state of mind or degree of restraint, whether before or after that time. But, in order to determine the capacity and its free action at the time the will is made, a wide range of inquiry is permissible into facts and circumstances, whether before or after the time of the making of the will, the better to enable the jury to determine the probable state of the mind and the extent and force of the restraint at the time the will was executed. And as regards undue restraints, it may be proper to remark that it is not necessary that the mind should act under influences at the time brought to bear, or then employed, but they may be such as have at a previous time been so fixed and impressed as to retain their controlling influence at the time the act is done. Nor is such restraint necessary to be effected by force or intimidation; for it has been held, upon authority, that if the mind acts by force of long training to submission, so that the will of another is adopted for its own, and without reflection, the party thus influenced is incompetent to contract. * * *

There is another ground, which, though not so distinct as actual force, nor so easy to be proved, yet, if it should be made out, would certainly destroy the will, and this is, if a dominion was acquired over a mind of sufficient sanity for general purposes, and of sufficient soundness and discretion to regulate his affairs in general; yet if such a dominion or influence were acquired over him as to prevent the exercise of such discretion, it would be equally inconsistent with the idea of a disposing mind."

This reasoning is adopted by the court in the case of *Kennedy* v. *Quinn*, 166 Ark. 509, 266 S. W. 462. There may be, however, influences which determine the action of the testator which are legitimate in their nature, such as that which springs from natural affection and which is occasioned by the associations of the testator with the beneficiaries in the ordinary affairs of life and by the confidential relations existing between them at the time of the making of the will. The influence which the courts reprehend, and which is considered sufficient to overturn the act of the testator, is that evil influence which springs from fear, coercion, or other causes which deprive the testator of his free agency and the disposing of his property. *Milton* v. *Jeffers*, 154 Ark. 516, 243 S. W. 60.

With these principles of law in mind, we proceed to the examination of the testimony introduced at the trial in the court below.

There is evidence that at the time of the execution of the will there was no one of the beneficiaries present, but the testator, unaccompanied, appeared in the office of an attorney and there informed the attorney as to how and to whom his estate should be given. The attorney, and others who happened to be in the office at the time, and who witnessed the will, gave as their opinion that, from their previous knowledge of the testator and of his conduct at the time, he had sufficient mental capacity to understand and appreciate the full force and effect of his testamentary act. Others, his neighbors, and men with whom he had had business transactions, told of the way

he transacted his ordinary business—how he would make purchases for himself and his neighbors, how he would sell his own and their products and account to those for whom he was acting for the proceeds of the sales made— and, basing their opinions on these facts detailed by them, stated that he was able to and did, through the course of many years, both before, about the time, and after the execution of the will, act with fairly good business judgment, and that they thought that he had sufficient mental capacity to execute his will and to make disposition of his estate in the manner he desired.

There was other testimony that his own children had virtually deserted him, electing to make their home with their mother, and that Mr. Jones resented this conduct on their part, and stated that they had ''thrown him down,'' and that he was going to ''throw them down;'' also that he was happy in the association of his second wife, who survived him, and her children, who had lived with him through many years, and that the will executed by him was the expression of a just resentment toward his own children and a reward for the care and affection which he had received from strangers to his blood.

But there was another state of facts presented by the testimony which was in conflict with that we have above related, and we are now to consider this testimony, giving the same its strongest probative value to ascertain if it was sufficient to warrant the trial judge in his finding against the will. For the purpose of this decision, we must view this evidence through the eyes of the trial court, who viewed the witnesses, considered their interest in the case, their knowledge and means of information, their demeanor while upon the stand, with all other surrounding circumstances, and whose province it was to judge as to their credibility and the weight of their testimony. Two facts are apparently undisputed in the evidence; the first is that the testator could, and did, attend to his ordinary business affairs with a fair degree of business judgment; the other is that he was a

man of feeble intellect, of low moral standards, and easily influenced by his associates. It appears that he had but a small amount of property, and that he made his livelihood by tilling a small farm and selling the produce derived from it, the most of his property having been acquired by inheritance from his parents, but which he did not dissipate, and perhaps made some slight additions to it. He married apparently early in life, and lived with his wife until 1893, she having borne him four children— two boys and two girls. In that year his wife obtained a divorce from him, and was awarded the custody of her children, all of tender years, the youngest being at that time only two years of age and the oldest being nine years of age. She was given, for the support of herself and these four children, one horse, one cow, ten head of hogs, and one-third of the proceeds of a hillside forty acres of land, all of which amounted to the sum of $150, and with this she and her four children went out into the world to live and thrive as best they might. It is shown that she asked for and obtained the divorce because of the thriftless and foolish conduct of her husband. A number of years after the divorce the father brought them back to his farm and there kept them for a short time. But in the meantime he had moved upon that farm a widow—the widow Poteet, with her numerous brood. He installed the widow and her children in the good house on the front of the farm, and put his own children, two of whom were girls, in a log hut on the back part of his farm, and in the evenings he spent his time with the widow.

It developed that about that time he sought to make his union with the widow more legitimate and lasting, she made a condition for the marriage that he should "get rid of his dern kids," which he did, telling them that they would have to go, and that, while he was fond of them and would love to keep them and send them to school, he couldn't do it. So the children, at that time ranging from fifteen to eight years of age, were again sent out into the world, human wreckage, while the father

was rewarded by the heart and hand of the charming widow. Jones, the testator, had frequently boasted about the country of his relations with the widow and with other women, so much so as to arouse the indignation of the community. After his marriage to Mrs. Poteet he permitted his children to return, and they were allowed to live with their father and stepmother for a year or thereabouts, when their stepmother again compelled their father to drive them from home. It seems he loved his children in a way, and was reluctant to make them leave, for, as his youngest son started away, the old man walked with him for two miles down the road and sorrowfully bade him a goodbye, telling him that he couldn't help it.

His second wife was about nine years older than he, and there was testimony of some of the neighbors that she could make her husband do anything she wanted him to do. It is clear that, if the testimony of his children is to be believed, she did have influence enough with him to coerce his will and compel him to drive his own flesh and blood from his door and deprive them of house and home. Later on, beginning with the year 1914 and at several times after that, one of his sons, who had grown to manhood and who had married, tried to rent land from his father, and was refused, because, as the old man said, ''Your stepmother and her children don't want you here,'' the stepchildren during all of these years having lived upon the farm of the ancestors of the Jones children, who had been dispossessed and driven away.

It was in 1916 that the will was executed, the testator at that time being 58 years of age, and he survived about nine years after the date of the execution of the will. There was testimony that, at or about the time of the execution of the will and continuing, the old man's mind was more feeble than it had been. When he was stricken with his last illness, the stepmother and her children appeared to resent the ministrations of his own children, who had come to be with their father in his

last illness and to wait upon him, and they studiously prevented any of his own children being alone with him during that time.

These are the facts indicated by the testimony of the witnesses introduced on behalf of the contestants. In the eyes of the trial judge the malevolent figure which stalks through the scenes of this sordid drama is the former widow Poteet, whose stronger will and vindictive nature and love for her own children controlled the will and actions of her husband with respect to his own flesh and blood. Applying the principles of law above announced to this testimony and indulging in the wide range of inquiry into the facts and circumstances, there is substantial testimony, which is permissible in cases like this, to warrant the trial judge in concluding that the influence of the testator's second wife, beginning even before their marriage and continuing on to the time of the execution of the will, had so fixed itself upon the mind of the testator as to dominate his will and be the controlling influence operating upon him at the time of the execution of the will. It was dominion acquired over a mind of sufficient sanity for general purposes and sufficient soundness and discretion to regulate his affairs in general, but, on account of the inherent weakness of his character, was such as to prevent the exercise of untrammeled judgment. It was not such restraint on the will as was effected by force or intimidation, but by a long training to submission, so that her will became his and his act the result of that influence so acquired and continued through the years.

As we have stated, this court is bound by the finding of the trial court, even though it might have been against the great preponderance of the testimony, if there was any substantial evidence to warrant his finding, and the testimony to establish that evidence must be given its strongest probative force. Under the rules announced, we think that there was legal testimony to warrant the trial court in its finding and judgment that the will was

invalid, and should be set aside.    The judgment is there-
fore affirmed.

KIRBY, J., dissents.