BROWN *v.* EMERSON.

4-7052                                    170 S. W. 2d 1019

Opinion delivered April 26, 1943.

*Murphy & Wood,* for appellant.

*C. A. Stanfield,* for appellee.

HOLT, J. Mrs. Lillie A. Brown died testate February 9, 1942. She left as sole survivor a son, I. G. Brown, 26 years of age, appellant here. Green Brown, the husband of Mrs. Brown, from whom she had been divorced, died in 1939.

Under the terms of her will, Mrs. Brown, after directing payment of debts, bequeathed to her son and Ina Marjorie Brown, her son's wife, certain personal effects, along with the furnishings in her apartment. In addition, the will contains these provisions: "Fourth: I devise and bequeath to my son, I. G. Brown, for his life only, the real estate situated at 1020, 1020½, and 1022 Central Avenue, Hot Springs, Arkansas, with remainder, at his (I. G.'s) death going to my brother, Clyde Emerson, and his heirs in fee simple. While I hope for my son a long and happy life, I realize the uncertainties of life and make this conditional provision for my dear brother, who was left motherless at the age of four, and my being unable to do anything for him has caused me much sadness. Fifth: Residue to I. G. Brown."

The personal property which Mrs. Brown bequeathed to her son and his wife was of the value of approximately $600, and the real property which she devised to her son for life, with remainder to Clyde Emerson, was of the approximate value of $35,000.

Appellee, Emerson, was one of Mrs. Brown's four brothers.

Appellant sought to prevent the probate of his mother's will on the ground of lack of testamentary capacity and undue influence. Upon a trial of these issues the trial court found against appellant's contentions, upheld the will and from the decree comes this appeal.

The case comes before us for trial *de novo*, and unless we can say that the decree of the lower court is not

supported by a preponderance of the testimony, it will be our duty to affirm it. After carefully weighing and analyzing all of the testimony presented in this record, we think the clear preponderance of the testimony supports both of appellant's contentions, and that the learned chancellor erred in holding otherwise.

We consider the questions of testamentary capacity and undue influence together, they being so interwoven. In *Phillips* v. *Jones*, 179 Ark. 877, 18 S. W. 2d 352, this court held (headnote 3): "Questions of testamentary capacity and undue influence are so interwoven in any case of will contest that the court necessarily considers them together."

There are certain well-defined principles of law to guide us in determining the issues presented. In the *Jones* case, *supra*, this court said: "Where the mind of the testator is strong and alert the facts constituting the undue influence would be required to be far stronger in their tendency to influence the mind unduly than in another, where the mind of the testator was impaired, either by some inherent defect or by the consequences of disease or advancing age. It is clear that feeble intellect will not be of itself sufficient to establish lack of testamentary capacity, for that condition must be so great as to render the testator incapable of appreciating the nature and consequences of his act; but this feebleness may be inferred when, from the facts in proof, it is apparent that he was incapable of appreciating the deserts and relations of those whom he excludes from participating in his estate, although he might have had the ability to retain in memory, without prompting, the extent and condition of his property, and to comprehend to whom he was giving it. *Taylor* v. *McClintock*, 87 Ark. 243, 112 S. W. 405; *Mason* v. *Bowen*, 122 Ark. 407, 183 S. W. 973, Ann. Cas. 1917D, 713."

In determining testamentary capacity a wide range of inquiry is permissible into all facts and circumstances. *Tobin* v. *Jenkins*, 29 Ark. 151; *Taylor* v. *McClintock*, 87 Ark. 243, 112 S. W. 405; *Hyatt* v. *Wroten*, 184 Ark. 847, 43 S. W. 2d 726. In *Hyatt* v. *Wroten* this court

said: "Undue influence is generally difficult of direct proof. It is generally exercised in secret, not openly, and like a snake crawling upon a rock, it leaves no track behind it; but its sinister and insidious effect must be determined from facts and circumstances surrounding the testator, his physical and mental condition as shown by the evidence, and the opportunity of the beneficiary of the influenced bequest to mould the mind of the testator to suit his or her purposes," and in the opinion there is cited with approval the case of *Newman* v. *Smith,* 77 Fla. 633, 82 So. 236, and it is there said: "It (the will) was in derogation of public policy as announced in the statutes of descent. It did violence to the dictates of natural affection, it repudiated his former protestations of love, it broke promises iterated and reiterated. Undue influence can seldom, if ever, be established by direct evidence, but we often find it conclusively shown by its results. . . . We do not mean to say that a will should be disturbed merely because it is unreasonable and unjust; but where it does violence to the natural instinct of the heart, to the dictates of fatherly affection, to natural justice, to solemn promises, to moral duty, such unexplained inequility and unreasonableness is entitled to great influence in considering the question of testamentary capacity and undue influence." "If the provisions of the will are unjust, unreasonable and unnatural, the court may consider that fact as a circumstance in determining the mental capacity of the testator." *Howell* v. *Miller,* 173 Ark. 527, 292 S. W. 1005.

And in Page on Wills, § 858, the textwriter says: "The weight of the evidence of an unnatural disposition depends in part on the extent to which injustice and violation of natural duty is carried. It is of great weight, when violation of natural duty is extreme." In 68 Corpus Juris, the textwriter, under the subject of wills, § 470, p. 790, says: "In determining the weight that should be given an unnatural disposition of the testator's property circumstances surrounding the execution of the will should be considered. Such disposition may be an important circumstance when considered with other evidence of undue influence, and it has been held that,

where a disposition is unaccountably unnatural, less evidence is required to establish undue influence.''

With these rules of law in mind we proceed to an examination of the testimony presented. At the very threshold we are confronted with an unnatural will, a will in which a mother would take away from her own flesh and blood, her only child, to whom her property would naturally descend, real property of the value of more than $35,000, and without any provision for possible issue of this 26-year-old son, devise this property to a brother who was at the time forty years of age and a successful business man.

Mrs. Brown, the testatrix, prior to the time that she became incapacitated, due to the inroads of a cancer, was a shrewd business woman. By their joint efforts, she and her husband, Green Brown, had accumulated the property involved here. During Green Brown's lifetime it was understood and agreed that this property should go to their son, appellant, at their death. A deep and natural affection existed between appellant and his mother, as well as between the mother and appellant's wife, Marjorie. They all lived together harmoniously. At Mrs. Brown's death her son was 26 years of age, had been married six years and had no children. The son, at the time Mrs. Brown wrote her will, was a ground instructor in Hot Springs for the Army Air Corps:

Mrs. Brown had four brothers, the appellee, Clyde, being the youngest and about forty years of age.

Mrs. Brown's death, February 9, 1942, was the result of a cancer which attacked her about June, 1936. The serious effect of this cancer on Mrs. Brown's mental and physical condition was noted by her family physician, Dr. Scott, about August, 1939. The cancer invaded Mrs. Brown's spinal column about October, 1941, causing paralysis. She was confined within her home until November, 1941, after which she had a partial stroke in her lower limbs from her waist down and was then confined to her room from the latter part of November until the date of her death. After her confinement to her room Mrs. Brown's suffering was so intense that it be-

came necessary to administer opiates, both hypodermically and by capsule. During all of this time she was nursed and cared for by Marjorie, her daughter-in-law, and by her son. Marjorie gave her the capsules and administered hypodermic on an average of six times each day. She required practically the same care as an infant. Appellant worked from ten to sixteen hours a day, but would come home from the air field when needed, which was about four times each day.

About four months before Mrs. Brown's death her four brothers began visiting her almost daily and to show much concern. They had frequent conferences with her, especially Clyde Emerson, the appellee.

Appellee owns property in Hot Springs, is comfortably situated and has independent means.

Shortly before her death, Mrs. Brown told appellant, her son, that she wanted to deed the real property here involved to him. But he assured her that it was not necessary since he did not desire to worry or disturb her on account of her condition.

The appellee, Clyde Emerson, the principal beneficiary under the will, without the knowledge of appellant or appellant's wife, about six weeks before the will was written, arranged with attorney, C. A. Stanfield, to come on call to Mrs. Brown's room to write her will. Mrs. Brown had never met Mr. Stanfield until he came to write her will. On the morning of January 13, 1942, around 11 o'clock, Mr. Stanfield says he received a call from Mrs. Brown to come. Following directions, Mr. Stanfield went to the testatrix's home and, without disclosing his mission, was admitted to her room, the door closed, and while alone with her for approximately an hour, wrote the will in question, and he, along with George G. Allenbrook, who was called, signed the will as witnesses. Appellant knew nothing of this will until after his mother's funeral when the witness, Allenbrook, told him about it.

At 10:30 in the morning, prior to the execution of the will from thirty to sixty minutes later, Marjorie had given her mother-in-law the usual hypodermic injection of morphine.

As to Mrs. Brown's condition between January 7 and January 10, 1942, before the will was written January 13 following, we quote from the testimony of her family physician, Dr. Scott: "She was in a dying condition. In addition to her cancer, I diagnosed her as having a distinct depressive psychosis with self-persecution symptoms. She was extremely ill, extremely emaciated. She had extreme anemia and was extremely depressed. I definitely think she did not have the capacity to make a will. Once or twice she did not recognize me until I got over to the bed and spoke to her. She was just practically a dead woman. She was worried all the time about herself and everything that came up. She was worried about her son, he was not in the right position. She was extremely weak, paralyzed in her shoulders, hips, and legs. The best description I can give is: She was a living dead woman. After December, 1941, she would have periods when she wouldn't know anything, especially right after she had had a shot of dope. They gave her double doses. In January, 1942, I don't believe she cared what happened, except to get relief from her pain." Mr. Allenbrook, the other attesting witness, testified: "She looked about as bad as a person could and still be breathing. She said, 'I did the very best I could for my children.' She was slumped over and didn't turn her head."

Appellant produced other witnesses who tended to corroborate Dr. Scott and Mr. Allenbrook. Dr. George B. Fletcher of Hot Springs, a specialist in neurology and psychiatry, in answer to a hypothetical question in which the material facts above enumerated were embraced, gave it as his opinion that Mrs. Brown lacked mental capacity to make a will at the time the will here was executed. Dr. Charles Garrett, another specialist, in answer to a similar hypothetical question to that propounded to Dr. Fletcher, tended to corroborate Dr. Fletcher's opinion.

On behalf of appellee, his attorney, Mr. Stanfield, testified that in his opinion Mrs. Brown possessed sufficient mental capacity at the time she executed the will, and in fact dictated parts of the will to him. The four

Emerson brothers, including appellee, were of the opinion that their sister, Mrs. Brown, knew what she was doing and was fully competent to make the will in question. There were other witnesses on behalf of appellee who were infrequent visitors at Mrs. Brown's home. We quote from the testimony of these lay witnesses: "She knew everything in the world, even to the very day of her death"; "she could have said anything, and it would have been right"; she had more sense than all of the rest of us put together"; "she was the most intelligent woman I ever saw; and I didn't observe any change in her except her weakness."

We think it must be apparent, in the light of all the other testimony adduced, that this last mentioned testimony coming from these infrequent visitors at the home of the testatrix, is highly exaggerated and extravagant, and therein lies its weakness.

As we have indicated, when all the testimony is carefully weighed and considered, it seems clear to us, that the great preponderance thereof is contrary to the findings of the court below. Accordingly the decree is reversed and the cause remanded with directions to deny probation of the will in question, and to proceed in a manner in conformity with this opinion.

McFADDIN, J., (dissenting). In this case I have not only read and studied the briefs, but have also read every word in the entire transcript. I reach the conclusion that the evidence does not show that the Chancery Court was in error. A lengthy statement, showing my reasons, would serve no useful purpose. But I respectfully dissent from the opinion of the majority.