ORR *v.* LOVE.

5-718                                    283 S. W. 2d 667

Opinion delivered November 7, 1955.

[Rehearing denied December 5, 1955.]

*Claude M. Williams, Duty & Duty* and *Bernal Seamster,* for appellant.

*Fairchild, Foley & Sammond; Rose, Meek, House, Nash & Barron; Vernon W. Thompson,* Attorney General of Wisconsin, *Roy G. Tulane,* Asst. Atty. General of Wisconsin, for appellee.

SAM ROBINSON, Associate Justice. This is a contest of a will of Alice A. Love executed on June 27, 1953, and a proceeding to establish the validity of a will executed by her on May 30, 1953. Appellants, Nellie Orr and other collateral heirs of Dr. George M. Love and Alice Love, are the contestants of the June 27 will and the proponents of the May 30 will; Elaine Love and the Board of Regents of the University of Wisconsin are the proponents of the June 27 will. Alice Love wrote five purported wills. The first was written in 1949, the second on May 30, 1953, the third on June 1, 1953, the fourth on June 24, 1953, and the fifth and last was executed on June 27, 1953. The last alleged will of June 27 was sustained by the Probate Court. In contesting this will, appellants claim that it was the result of undue influence and fraud, and ask that the May 30 will be probated instead.

George M. Love was a doctor and lived with his wife Alice in Rogers, Arkansas for many years. They had one child, George R. Love, who was also a doctor. In 1923, soon after the son's graduation from medical school, he married and located in Oconomowoc, Wisconsin, a small city near Milwaukee. George M. Love had made a will years before his death leaving all of his estate, with

the exception of $500.00 for his son, to his wife Alice. In 1949, acting on the advice of her son, George R. Love, Alice Love made a will leaving all of her property to her son, or to his estate in the event he predeceased her.

On May 26, 1953, the son, George R. Love, died leaving an estate valued at more than half a million dollars. Four days later, the father, George M. Love who lived in Rogers, died leaving an estate valued at about $125,000. The son, George R. Love, left a will setting up two trusts, one known as the Elaine Love Trust and the other known as the George R. Love Trust. His widow Elaine Love, the appellee herein, is the principal beneficiary. In addition to her rights under the Elaine Love Trust, she is to receive the income from the George R. Love Trust for life. After Elaine Love's death, the income from the George R. Love Trust goes to her parents for their lifetime; the corpus of the George R. Love Trust then goes to the Board of Regents of the University of Wisconsin to be used to assist athletically minded students in obtaining an education. Elaine Love and Mr. Lynford Lardner, attorney for George R. Love who is now representing his widow, were named as trustees. Under the terms of the will, the trustees have almost unlimited powers; they may move the situs of the trust to any State or foreign country, and are not required to account to anyone for their actions. The George R. Love will setting up these two trusts is very long and involved and consists of over fourteen typewritten pages. For a thorough understanding of its terms considerable study is required.

Mr. Claud Williams, an attorney in Rogers, Arkansas, had represented Mrs. Alice Love for many years. His secretary, Mrs. Jeffa Scott, had looked after business matters for Alice Love and prepared her income tax statements for several years. Elaine Love knew of the close professional relationship between Mr. Williams and Mrs. Alice Love. When George R. Love died on May 26, 1953, Elaine thought it better to let Mr. Williams notify Alice of her son's death; Elaine therefore had her attorney, Mr. Lardner, telephone Mr. Williams. Four

days later on May 30, at about 3 o'clock in the morning, Alice Love's husband, Dr. George M. Love, died; Elaine was promptly informed of his death. About 10 o'clock that same morning, Alice Love went with Jeffa Scott to Claud Williams' office where she made a new will leaving the bulk of her estate to her two sisters and to the brother and sister of her late husband. She also left $500.00 to the Rogers Public Library, $500.00 to Cecil Miller, $100.00 to Elaine Love, as well as other bequests of $100.00 each to several nieces and nephews. After Mrs. Love signed this will, she left it in Mr. Williams' office.

Elaine Love arrived at Joplin, Missouri by plane on May 31 and was met there by Cecil Miller, longtime friend of Dr. Love and his wife Alice. During the trip from Joplin to Rogers by automobile, Miller told Elaine about Alice Love having made a new will. Elaine was extremely displeased upon learning this. She did not go directly to the Love home in Rogers but stopped at a hotel, obtained a room and while there put in a long distance call to Mr. Lardner, her attorney in Milwaukee, to discuss with him the fact that Mrs. Love had made another will. She apparently discussed with Lardner the advisability of having Mrs. Alice Love execute still another will and also talked about obtaining a power of attorney from Alice. Following this conversation Elaine went to the Love home, and the next morning took Alice Love to the office of Mr. Williams where Alice obtained the will she had executed two days before. Although there is some confusion in the testimony as to just exactly what happened next, it appears that Alice Love took the will and put it in her lock box at the bank. Elaine then took Alice to Bentonville to the office of Mr. Vol Lindsey, an attorney of that city. There Alice made a new will leaving her entire estate to Elaine. This will was executed on June 1, only two days after Alice had executed the will drawn by Mr. Williams at her request. Mr. Lindsey was not told about the May 30 will.

In the meantime, Elaine had again called Mr. Lardner and had instructed him to prepare a power of attor-

ney. Mr. Lardner drafted a general power of attorney and sent it to Elaine in Rogers. This document gave Elaine authority to do anything she might wish with any and all property belonging to Alice, and it was signed by Alice on June 3. On the same day, Alice also changed her bank account, consisting of about $12,000, from a personal account to a joint one with Elaine. On June 4, Elaine returned to Milwaukee. On the 10th day of June she again came to Rogers and returned to Milwaukee on the 13th. A few days later, Alice wrote to Elaine requesting that she return the power of attorney. In the meantime, Alice destroyed the June 1 will which she had executed in Bentonville leaving everything to Elaine, and changed her bank account back into her own name only. On June 24, Alice wrote what purports to be her fourth will, in which she made $1,000 bequests to each of her sisters and to the brother and sister of her late husband, and left Elaine corporate stock apparently valued at about $47,000. This June 24 will then provides: "If any of estate is left then it shall be used to promote my sons education proposition." As a matter of fact, there would have been under the terms of this document a residuary estate valued at more than $50,-000 after the special bequests. Elaine says that on June 25 Alice called her and asked her to have Mr. Lardner prepare another will. Elaine did this and left Milwaukee on the 27th day of June, taking the new will with her to Rogers. On that same day, while Elaine was present, Alice signed the will. This was the fifth purported will of Alice Love. On June 29, while Elaine was still in Rogers, Alice's personal bank account of about $12,000 was again made into a joint one with Elaine.

This will of June 27 left the entire estate of Alice Love to the George R. Love Trust. Since Elaine receives the income from this trust for life, she will benefit by approximately $48,000 under the terms of Alice Love's June 27 will. Elaine was also named executrix to serve without bond.

After Alice signed the June 27 will, Elaine stayed in Rogers for about a week and then returned to Mil-

waukee. On September 12, Mrs. Alice Love's health had become such that it was necessary to move her to a hospital. Elaine returned to Rogers on September 22 and stayed at the Love home until October 10. Mrs. Alice Love died on October 16. The June 27 will was offered for probate and this action contesting it was filed.

We now mention some of the rules of law by which we must be guided in reaching a conclusion as to the validity of the will. In a leading case this court said: "The fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property. And the influence must be specially directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them in confidential relations with them at the time of its execution." *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590. The burden of proving undue influence is on the contestants. *Werbe* v. *Holt,* 218 Ark. 476, 237 S. W. 2d. 478; *Shippen* v. *Shippen,* 213 Ark. 517, 211 S. W. 2d. 433; *McWilliams* v. *Neill,* 202 Ark. 1087, 155 S. W. 2d 344; *Smith* v. *Boswell,* 93 Ark. 66, 124 S. W. 264. But, when it is shown that the will is drawn or procured by a beneficiary, there is a presumption of undue influence. Page on Wills, Vol. 2, p. 636. Where the beneficiary plans the will and causes it to be executed, the same rule applies as where he drew the will. *Ibid.,* p. 638. This court has said: "When a will is written, or proved to be written by a person benefiting by it, or by one standing in the relation of attorney or counsel, and who is also benefited by it,—these are circumstances to excite stricter scrutiny and require stricter proof of volition and agency." The court then quotes with approval from *Breed* v. *Pratt,* 18 Pick. R. 115, as follows: "It is incumbent on those, who, in such a case,

seek to establish the will, to show beyond reasonable doubt, that the testator had both such mental capacity, and such freedom of will and action, as are requisite to render a will legally valid.'' *McDaniel ad.* v. *Crosby et al,* 19 Ark. 533. The presumption of undue influence is not one of law but is a presumption of fact and subject to rebuttal. *Zeigler* v. *Coffin,* 219 Ala. 586, 123 So. 22, 63 A. L. R. 942. There is also a similar presumption where one who draws a will is named a trustee therein and is to receive large compensation for his services. Page on Wills, Vol. 2, p. 644; *Zeigler* v. *Coffin,* 219 Ala. 536. The cause is tried *de novo* here and the preponderance of the evidence rule prevails. *Brown* v. *Emerson,* 205 Ark. 735, 170 S. W. 2d. 1019. The question of undue influence and mental capacity are so closely interwoven that they are considered together. *Phillips* v. *Jones,* 179 Ark. 877, 18 S. W. 2d. 352. It is necessary to the validity of a will that the testator know its contents. In *Meek* v. *Bledsoe,* 221 Ark. 395, 253 S. W. 2d. 369, this court quoted with approval from 68 C. J. S. 606: ''It is indispensable to the validity of a will that the testator should know its contents at the time of its execution, knowledge after the execution being insufficient. However, as elsewhere shown, knowledge will ordinarily be presumed from the execution of the instrument, although the presumption is only a *prima facie* one and may be rebutted. If it appears affirmatively that he did not read the will and that it was not read to him, it must be shown that the contents were in some way known to him.''

We must bear in mind that Elaine is one of the principal beneficiaries named in Alice Love's June 27 will, and that the will was prepared by this beneficiary's lawyer at her request and according to her instructions. Moreover, Mr. Lardner is one of the trustees named in the George R. Love Trust which is incorporated by reference in Alice Love's June 27 will. In the event of Elaine Love's death, Mr. Lardner would be the sole trustee. With the broad powers given to him as trustee, he could benefit considerably from the George R. Love Trust and hence from the June 27 will of Alice Love. Since both Elaine and Mr. Lardner would benefit under the

terms of the June 27 will, and since Lardner was acting on instruction from Elaine when he prepared the will, it is the proponents' burden to prove not only that Alice Love had the mental capacity to execute a valid will but that she was free from undue influence and understood the terms of the will. The proponents of the will have not met this burden.

Elaine attempts to make a reasonable explanation of everything that was done and to show that the will was not made because of any undue influence on her part, and that there was no fraud in failing to fully inform Alice Love about the George R. Love Trust. Both sides offer expert and lay testimony as to the mental capacity of Alice Love. But this is a case where actions speak louder than words. Undue influence may be inferred from facts and circumstances. *Alford* v. *Johnson,* 103 Ark. 236, 146 S. W. 516. "Undue influence is generally exercised in secret, not openly, . . . its sinister and insidious effect must be determined from facts and circumstances surrounding the testator, his physical and mental condition as shown by the evidence, and the opportunity of the beneficiary of the influenced bequest to mold the mind of the testator to suit his or her purposes." *Hyatt* v. *Wroten,* 184 Ark. 847, 43 S. W. 2d. 726. The undisputed facts and the reasonable inferences to be deduced from such facts inevitably lead to the conclusion that Alice Love was not acting according to her own free choice in executing wills at any time after Elaine's arrival in Rogers on May 31, 1953. In the first place, on May 30 Alice Love had gone to her lawyer's office and made a will. She had gone to a man she had known and trusted for many long years, the same man who had been selected by Elaine to notify Alice of her son's death. This lawyer's secretary had also been Alice's longtime friend and business advisor. It is argued that Jeffa Scott, the secretary, wrongfully induced Alice to go to Mr. Williams' office and execute the May 30 will, wherein Jeffa was named executrix. But we are not convinced at all that Alice went to Mr. Williams' office due to importunities on the part of Jeffa Scott. On May 27, the day after the son, George R. Love, died, a Mrs.

Chandler was present in the Love home in Rogers and heard Alice say to Jeffa Scott: "Now, Jeffa, I want to get that will [the 1949 will] changed and I want to get it right." And Jeffa replied: "Now, Mrs. Love, there's plenty of time to do that. You don't need to rush anything like that." We are convinced that Alice went to Mr. Williams' office because she wanted to dispose of the business of making a will as quickly as possible. By the recent death of her husband, she had acquired a large estate and the unexpected death of her only son had changed the situation considerably. In her May 30 will she did the natural thing, the thing that anyone would expect her to do; the large bulk of her estate was left to her two sisters and to the brother and sister of her late husband. The evidence is convincing that the May 30 will was the free and voluntary act of the testator.

It is argued that Alice Love had not been in contact with her two sisters for a long time and was hardly acquainted with the brother and sister of her husband; but she was certainly better acquainted with them than with the parents of Elaine to whom she left a contingent life estate under the terms of her June 27 will. Furthermore, the record indicates that the relationship between Alice and Elaine was not a close one. Alice lived in Rogers, Arkansas, and Elaine in Wisconsin. They had only seen each other on a few visits during their entire lives. There is no evidence of any correspondence written prior to June, 1953, that shows any affection whatever between them, and yet, the day after Elaine's arrival in Rogers on May 31, she took Alice to an attorney's office in Bentonville where Alice made a will leaving her entire estate to Elaine. Elaine tries to explain taking Alice to an out-of-town lawyer's office by saying that she was mad at Mr. Williams, claiming that he had wrongfully prevailed on Alice to make a new will so soon after the death of her husband. The record does not justify a conclusion that Mr. Williams induced Alice to make a new will or any will at all. Actually, May 30 was a holiday, and Williams did not want to come to the office, only doing so after he was called twice. He charged

only a nominal fee of $25.00 for drawing the will, and received no other benefits from it. The fact that Elaine took Alice to an out-of-town lawyer on June 1, and not to Mr. Williams, the lawyer who had been Alice Love's legal advisor for many years and who had written wills for her on previous occasions, is in itself a suspicious circumstance; especially so in view of the fact that Elaine, upon her arrival in Joplin and being told by Cecil Miller about the May 30 will, called Mr. Lardner, her attorney in Milwaukee, with reference to the will and the advisability of obtaining a power of attorney from Alice.

We do not believe there is a shadow of a doubt but that Elaine called Mr. Lardner seeking advice with reference to avoiding in some manner the May 30 will. Elaine attempts to show that the June 1 will, in which Alice left to her the entire estate, was not due to any conniving on her part, and tries to explain that the June 1 will was only a stop-gap to serve until such time as another will could be prepared in which Alice would leave the bulk of her estate to the George R. Love Trust. It is explained that Mr. Lindsey, the lawyer who prepared the June 1 will, did not have sufficient information about the trust to make a will whereby Alice would leave her estate to that trust. Mr. Lindsey is an able lawyer. He lives in Bentonville, a town very near Rogers, and yet, at no time subsequent to June 1, was he furnished with the necessary information about the George R. Love Trust so that he could prepare another will for Alice Love. Also, when Elaine was in Rogers from the 10th to the 13th of June, she did not mention the will business to Alice, or bring with her from Milwaukee a copy of the George R. Love will.

Another circumstance which carries great weight in establishing the fact that Alice Love was unduly influenced by Elaine is that Alice signed the power of attorney. This power of attorney is very broad. It was prepared by Elaine's lawyer in Milwaukee and signed by Alice on June 3, just four days after the death of Dr. Love, Sr., and only four days after she had executed the

May 30 will, of her own volition, leaving Elaine only a token $100.00. But that is not all. On June 3, Alice's bank account, consisting of about $12,000, was changed to a joint account for herself and Elaine. From the record, we can conclude that Alice Love was very frugal and careful about any expenditure of money, and the evidence in this case is far from convincing that Alice would, of her own free will, give power of attorney or joint account privileges to Elaine. Subsequently, Alice revoked the power of attorney and changed the bank account back to her own name. But the bank account was again changed to a joint one when Elaine next came to Rogers.

Moreover, the record is replete with evidence to the effect that at all times following May 30, Alice Love was using habit-forming drugs that produced both a sedative and hypnotic effect. She was weak physically and mentally. She was worn out from caring for her husband who had been bedfast for several years prior to his death. She was 77 years of age, and lived only three and a half months after the deaths of her husband and only son.

Although there is a rebuttable presumption that Alice knew the effect of her will when she left all of the estate to the George R. Love Trust, 57 Am. Jur. 573, this presumption is overcome by a preponderance of the evidence. For one thing, Elaine never told Alice about her life estate in the George R. Love Trust or the interest of her mother and father in the trust. Elaine testified that Alice understood her money was to go to the George R. Love Educational Fund and not to Elaine in any way. Elaine even states in the petition for probate of the June 27 will that she has no interest in Alice Love's estate, when as a matter of fact, under the terms of this will she has a very large interest amounting to about $48,000. Also, Alice never saw a copy of the George R. Love will setting up the trusts, although it is claimed that she read newspaper articles explaining the will. However, the only article that described the terms of the George R. Love will was not published until June 18,

and it appears that all the clippings referred to by witnesses which Alice Love saw were published prior to that date.

The record does not lead one to believe that Alice had any idea that she was leaving a life estate to Elaine and then to Elaine's parents before her money would ever go to an educational fund. There is nothing in Alice's June 27 will to indicate that she herself had any knowledge of the actual results of the terms of that will. Elaine testified that both she and Alice thought that, under the terms of the June 27 will, Alice's estate would go directly to the educational fund and that none of it would go to Elaine. This shows conclusively that Alice did not understand the contents of the will.

We have concluded that the May 30 will was the free and voluntary act of Alice Love. Due execution of this will was established. The same evidence which is convincing that subsequent wills grew out of undue influence persuades us that the May 30 will was destroyed as a result of that same undue influence. The making of one and the destruction of the other were parts of one transaction.

In 57 Am. Jur. 323, it is said: ''When a testator in destroying his will acts under fraudulent and undue influence, the will is considered not to have been revoked, and may be admitted to probate on establishing facts showing the existence and due execution of the will and its destruction by reason of such improper influence. The execution of a will and the destruction of a former will may be so closely connected in point of time as to constitute one transaction, indivisible as to inducement and purpose, so as to render inescapable the conclusion that undue influence sufficient to invalidate the later will rendered the destruction of the former will ineffective as a revocation.'' In support of the text there is cited *In re Simmons' Estate,* 166 Minn. 65, 207 N. W. 189, and *Neal* v. *Caldwell,* 326 Mo. 1146, 34 S. W. 2d 104, 109. In the *Simmons* case, 28 R. C. L. 168 is quoted with approval as follows: ''A will destroyed by the testator himself in his lifetime, acting under fraudulent or undue influ-

ence, is not considered as having been revoked, and may be admitted to probate on establishing facts showing the existence and due execution of the will, and its destruction by such improper influence.''

It appears that when Mrs. Elaine Love took Alice to Mr. Williams' office on June 1 to get the will Alice had executed May 30, Alice had not been completely influenced to revoke that will. This is indicated by the fact that the will was not destroyed immediately, but was taken to the bank in Rogers and placed in Alice's lock box. Later, when Elaine and Alice returned from Bentonville where Alice had executed the June 1 will, they again went to the bank and obtained the May 30 will. There Elaine says that Alice tore it into pieces; but Elaine kept the pieces and delivered them to her lawyer, Mr. Lardner, in Milwaukee. Mr. Lardner kept the torn pieces in his files. They were put back together and later introduced as evidence in this case. The May 30 will is not so badly mutilated that its terms are not clear. Moreover, the notebook of Mr. Williams' secretary containing the terms of the May 30 will was available as evidence.

Proponents of the will further contend that even if the June 27 will was the result of undue influence, the testator ratified it by not changing the will between the time it was made and the time of her death some three months later. In support of this contention there is cited *Cude* v. *Culberson*, 30 Tenn. App. 628, 209 S. W. 2d 506. However, in the *Cude* case there was a republication of the will in the nature of a codicil executed some fifteen years after the making of the original will. In Page on Wills, Vol. 1, p. 392, it is said: ''Since a will must be either valid or void and cannot be voidable, the doctrine of ratification has no application. If the will is invalid when made, the only method by which it can be made valid, in accordance with the statutes of wills, is by re-execution or republication.'' In 57 Am. Jur. 257, it is said: ''Undue influence, fraud and mistake are recognized grounds for contesting the probate of a will or setting aside probate, except where there has been a valid

re-execution or republication of the will.'' In the case at bar, there was no republication.

The judgment is reversed with directions to set aside probate of the June 27 will and to admit to probate the will of May 30.

The Chief Justice and Mr. Justice GEORGE ROSE SMITH not participating.

Mr. Justice McFADDIN concurs.

Mr. Justice WARD dissents.

ED. F. McFADDIN, Associate Justice (concurring). By an entirely different process of reasoning I have finally reached the same conclusion as that stated by Mr. Justice ROBINSON, who is joined by Justices HOLT and MILLWEE. Since my vote is necessary to make the Constitutional requirement of four Justices voting for the same result, I think it incumbent on me to state my course of reasoning.

I. *Mental Capacity Of Mrs. Alice Love.* The evidence convinces me that — absent any fraud or undue influence — Mrs. Alice Love was mentally capable of executing a will at any time from May 30th to June 27th. Neither her grief, use of drugs, age, or anything of that kind, impaired her mental faculties so as to prevent her from executing a will if she was at such time free from fraud and undue influence. The evidence convinces me: (a) that Mrs. Alice Love's will of May 30th was her free and voluntary act without any undue influence or fraud of any kind; (b) that when she executed the instrument of June 1, 1953, she was under the undue influence of her daughter-in-law; and (c) that Mrs. Alice Love was a victim of fraud when she executed the will of June 27th.

II. *The Fraud In The Will Of June 27th.* This is a most serious charge, but I am convinced of the correctness of my position. After the death of her only son, George, Mrs. Alice Love was anxious to let her estate go to the educational enterprise that he favored.

In her attempted will of June 24th she said: "If any of estate is left then it shall be used to promote my son's education proposition. . . ." Mrs. Elaine Love knew of Mrs. Alice Love's desire that her estate go to the "education proposition." On June 8th Mrs. Alice Love wrote Mrs. Elaine Love: "When you come bring me lots of data of George's instructional. . . . I thought Vol Lindsey would be interested and I would like to know more myself." Again Mrs. Love wrote her daughter-in-law: "I don't remember much of will either — only he didn't put in that trust clause".[1] In another letter, Mrs. Love wrote her daughter-in-law: "I wonder if that will is good even if William scratched some of the school trust;" and in another letter Mrs. Alice Love wrote her daughter-in-law: "Have your lawyer make us a will . . . and give name and object of George's project." The foregoing excerpts—and there is much other testimony to like effect—show that Mrs. Alice Love was interested in the *"education proposition"* that her son George had started.

But does the will of June 27th accomplish what Mrs. Alice Love wanted? Does it give her estate to the "educational proposition?" The answer to these questions is in the negative. The June 27th will leaves her estate to the *George R. Love Trust* instead of to the *George R. Love Educational Fund;* and the fraud consists in making Mrs. Alice Love believe that the *George R. Love Trust* was in fact the *George R. Love Educational Fund.* The George R. Love will was never shown to Mrs. Alice Love.[2] She was led to believe that the "George R. Love Trust," as mentioned in her will of June 27th, was the

---

[1] This evidently referred to the fact that Mr. Vol Lindsey had stated that he didn't know enough about the George R. Love Educational Fund to incorporate its provisions in the will.

[2] In the oral argument before this Court one of the three attorneys who spoke for the appellees said that Mrs. Alice Love never saw her son's will and that she would not have understood it if she had seen it. Furthermore, Mrs. Elaine Love testified on Tr. 931: "Q. Now, Mrs. Love, didn't you feel that sometime, even when you came down here on the 27th of June that it would be a most nice favor, an expression of love and affection, for you to take the will of her only son and read it to her, paragraph by paragraph, didn't you feel that you should have done that? Didn't you? A. No, sir, I didn't, Mr. Duty. Q. She never saw a copy of it, did she? A. No, sir."

*Education Fund* which her son had established in his will. In truth and in fact, the ''George R. Love Trust'' was vastly different.

The George R. Love will introduced in evidence in this case shows that he set up two trust funds. The first was the ''Elaine Love Trust,'' which consisted of a large portion of his estate. The second was the ''George R. Love Trust'' and it provided: (a) that Elaine Love should receive the entire annual net income of the George R. Love Trust as long as she lived; (b) that after her death the net income of the George R. Love Trust would go to Mrs. Alice Love and to Mrs. Elaine Love's mother, Christiana Lundblad, and to Mrs. Elaine Love's father, Oscar Lundblad, as long as any of them lived; and (c) that, upon the death of Mrs. Elaine Love and the parents of George R. Love and the parents of Mrs. Elaine Love, the Trustees would transfer the residue of the ''George R. Love Trust'' to the ''George R. Love Educational Fund,'' which was to be administered by the Board of Regents of the State of Wisconsin. In short, the will that was drawn and presented to Mrs. Alice Love on June 27th gave all the income of her estate to Elaine Love and Elaine Love's parents as long as any of them lived and then the residue of Mrs. Alice Love's estate would go to the George R. Love Educational Fund.

Mrs. Alice Love was led to believe that when she executed her attempted will of June 27th her estate was going to the *George R. Love Educational Fund* and certainly not to Mrs. Elaine Love's parents. The actual information was withheld from her, and so she executed an instrument on representations which amounted to fraud. Fraud vitiates everything it touches. In 57 Am. Jur. 267, in discussing fraud as an independent ground of will contest, the holdings of the many cases are summarized in this language:

''A will procured by fraud or deceit *is void,* except where there has been a valid re-execution or republication of the will. Fraud in the sense of deceit is a ground of contest separate and distinct from that of undue in-

fluence. To make a case of undue influence, the free agency of the testator must be shown to have been destroyed; but to establish a ground of contest based on fraud, the free agency of the testator need not be shown to have been destroyed. Fraud is present to invalidate the will if by misrepresentations and deception the testator is led into making a will different from what he would have made but for the misrepresentation and deception.''[3]

So I conclude that the will of June 27th was void because of fraud, even if the language in the instrument was sufficient to incorporate by reference the provisions of the will of George R. Love. It is unnecessary for me to dwell on this matter of incorporation by reference.

III. *Directive On Remand.* This is the point that has given me most serious concern. Justice Robinson's opinion concludes with this directive:

"The judgment is reversed with directions to set aside probate of the June 27th will and to admit to probate the will of May 30th."

I have wondered if the May 30th will was not destroyed sufficiently to constitute revocation; but I have concluded that the appellees have nothing to gain on that score, so this question can be answered in the negative. The will of May 30th was proved as validly executed. The will of June 1st fails because it was executed under the undue influence of Mrs. Elaine Love. The will of June 24th was never proved by the attesting witnesses. In the oral argument before this Court I repeatedly questioned counsel for appellees as to why no effort was made to prove this June 24th will as an alternative to the June 27th will. I received no satisfactory answers. The fact remains that one of the attesting witnesses of the June 24th will never testified in the case and the other attesting witness was not interrogated

---

[3] There are annotations in 28 A. L. R. 787 and 92 A. L. R. 790 containing the cases from which the quoted rules above have been formulated.

as to the facts surrounding the attestation of the June 24th will. The will of June 27th fails because of fraud.

In the light of all the above, the will of May 30th remains as the last valid will of Mrs. Alice Love. In the Trial Court the issue was sharply drawn between the May 30th will and the June 27th will; and a transcript containing over 1,000 pages is before us in this case. The printed abstracts and briefs in this Court contain 1131 pages, besides typewritten briefs agreed to be furnished at the time of the argument here. To remand the case ''for further development'' would be wrong, in view of the full development that has already been made. Therefore I concur with the directive on remand, as contained in Mr. Justice ROBINSON's opinion.

PAUL WARD, J., dissenting. A careful consideration of this case forces me to a different conclusion from that of the majority.

Mrs. Alice Love made a will in 1949 leaving her estate to her only son. On May 30, 1953, four days after the death of her son and seven hours after the death of her husband Mrs. Alice Love made a will [revoking her 1949 will] leaving the bulk of her estate to her two sisters and the brother and sister of her husband, some of whom she had not seen in years and one of whom she said she would not know if she met her on the street. This last will Mrs. Love destroyed with her own hands, and on June 27, 1953 she executed another will—the one here contested.

The majority opinion voids the June 27th will and reinstates the May 30th will—just the opposite of what the Chancellor did. To justify such action on the part of the majority compelling reasons should appear.

I submit that no such reasons are set forth in the majority opinion and that none appear in the record.

Under the record in this case it is obvious that the June 27th will can only be set aside by establishing at least one of these things; (a) Mental incapacity,· (b) Un-

due influence, or (c) Fraud. These will be discussed in that order.

(a) *Mental Capacity.* We do not understand that the majority or the appellants lay much, if any, stress on the lack of mental capacity of Mrs. Love to execute the June 27th will. At the end of the first paragraph in the majority opinion appears this sentence: "In contesting this will appellants claim that it was the result of *undue influence* and *fraud.* . . ." Nothing is said of lack of mental capacity. The only allegation in the complaint relating to lack of mental capacity is a statement to the effect that Mrs. Love, "on account of her advanced age, her failing health and the grief" [recent loss of husband and son] was on June 2nd, 1953, in the hands of Elaine Love . . . "as clay in the hands of the potter." This statement by appellants must be weighed in the light of the following facts: Appellants claim [and the majority hold] that on May 30, 1953 Mrs. Love had mental capacity to execute a will, but now contend that three days later she had advanced in age and deteriorated in health to such an extent that her mind had deteriorated. Nor can we understand why her grief would be less on the day her husband died than it was three days later.

In an attempt to show that Mrs. Love lacked mental capacity shortly before and on June 27, 1953 appellants showed that Mrs. Love had been taking sedative tablets. It was claimed that the continued use of these tablets rendered her incompetent and that, if she left them off, she would be worse off mentally. Again this contention is wholly lacking in force. The record is that Mrs. Love did take such tablets, but she had been doing so long before the May 30th will was executed, and they were given to her by her family doctor and her doctor son. Appellants must concede Mrs. Love's mental capacity was not impaired on May 30, 1953 just 29 days before the contested will was executed. Moreover I for one would not like to intimate that Mrs. Love's son and her family doctor either ignorantly or intentionally de-

stroyed her mind by giving her drugs which would do so if she took them or if she quit taking them.

There can be, I think, no question about Mrs. Love's mental capacity on June 27, 1953. The record is replete with evidence that she transacted business as usual from the death of her husband until June 25, 1953.

(b) *Undue Influence.* Much of what has already been said refutes the charge that Elaine unduly influenced Mrs. Alice A. Love to make the will in contest. To my mind the entire record refutes such a charge under the rules announced in the majority opinion.

1. The foundation of appellants' contentions and the majority opinion, it seems to me, must rest on the assumption that Elaine is a strong willed, unprincipled, and selfish woman. In the Petition it is alleged that Mrs. Alice Love knew her to be "strong and forceful and to be selfish and greedy," and that Mrs. Love feared Elaine. The record does not justify this appraisal of Elaine's character, but, on the contrary, it shows the exact opposite. The only testimony in the record about Elaine's character is that given by Attorney Lardner who had known her intimately from her childhood. According to him Elaine, a woman 50 years old, is friendly and likeable. He said of her: "She is sensitive and I believe a very gentle person, so gentle she is almost fragile, . . . nor can I picture her coercing anyone nor exercising the slightest degree of influence over anyone in a business or financial matter." Of course this could possibly be the picture of a biased friend, but it is the only picture we have based on the record, and it is not unlike the woman you would expect a man of George R. Love's character to select for a wife.

2. Did Mrs. Alice A. Love "fear" or did she love and respect her daughter-in-law, Elaine? Though it is true she had not had the opportunity to know Elaine well prior to May, 1953 due to the fact they were both wives of busy doctors in different states, yet the record reflects nothing but love and respect after that time.

The record contains six letters written by Mrs. Alice Love to Elaine, between June 6 and June 24, 1953, which show only love and respect for Elaine. The record also contains nine such letters after the will was made.

3. The Power of Attorney, the joint bank account, and numerous will. Somehow, appellants profess to believe, all these things indicate a weak mind on the part of Mrs. Alice A. Love and undue influence on the part of Elaine. The record explains these things and disputes the justification for any such belief. The Power of Attorney and joint bank account were executed by Mrs. Alice A. Love, with her full knowledge and consent, at a time when she was sick and grief stricken, with the idea that Elaine could help her better manage her extensive business activities and especially in the event she should become incapacitated. It soon developed that she got better and was able to transact her own business, and so, using good business judgment, she revoked them. The salient point is, Elaine never tried to exercise any authority under them although she had the time and opportunity to do so.

The record gives a rational explanation for the different wills. The first was executed in 1949 [estate to son] before her husband and son died. The second one was executed May 30, 1953 seven hours after her husband died, in which she gave her estate to her and her husband's sisters and brothers, some of whom she had not seen in years. Later she went to the bank, got this will and tore it in pieces. After two days reflection she executed the third will to Elaine. It was explained that this was a "stop gap" will until a proper one could be made to give the bulk of her estate to her son's Educational Fund. The fourth will was made, in her own handwriting, as her own effort when, according to her letters, she could not hear from Elaine who was in Wisconsin. The fifth and last will was prepared, at her request, by the Wisconsin Attorney who wrote her son's will. This series of events, I submit, reveal a course of meditation and judgment much more than it shows

fraud, undue influence or mental incapacity. The last will was witnessed by Mr. and Mrs. Mackey, who said she read it, and that she was mentally alert at the time— facts not denied. After this will was executed she had 110 days [before her death] to reflect on what she had done and change her mind [in the absence of Elaine] if she desired to do so. She never did.

(c) *Fraud.* Before discussing this last ground for setting aside the June 27th will it is pertinent to observe that we have the following situation. Three of the judges helping make the opinion base the same on three grounds, viz; lack of mental capacity, undue influence and fraud. The concurring opinion specifically rules out lack of mental capacity and undue influence and rests solely upon the ground of fraud. Since it takes a majority of this court, or four in number, to make an opinion I conclude that now we have an opinion in this case which sets aside Mrs. Love's June 27th will solely on the ground of fraud. Hereafter I shall refer to the majority opinion as the combined opinion of the four judges.

As I read the record and the majority opinion only one incident is relied on to show a "fraudulent representation" on the part of Elaine. I shall now discuss this question of fraud.

In the second paragraph of Mrs. Alice A. Love's will [being contested] she stated: "My only son, George R. Love, having preceded me leaving one-half his estate to an educational trust fund and to aid and assist worthy, ambitious and needy young men . . . it is my desire to further his wishes and intentions in this regard by adding my own estate to the funds which his worthy objects are to be fulfilled." Following this she gave her estate to the "George R. Love Trust which is created under the last will and testament of George R. Love dated May 26, 1953. . . ."

The George R. Love will gave one-half his estate to his wife, Elaine, and the other half to the "George R.

Love Trust"—the fund to which Mrs. Alice A. Love's estate was added by her will. The "fraudulent representation" relied on by appellants is that Elaine did not tell Mrs. Alice A. Love that she, Elaine, would, under the terms of George R. Love's will, get the *income* during her life time from this Trust.

It will be noted that Elaine is not charged with any fraudulent misrepresentation, but, in effect, she is charged with fraudulently concealing vital information which she, Mrs. Alice A. Love, did not have or know.

The charge against Elaine of concealing valuable information from Mrs. Love at the time she made her June 27th will really consists of two parts which are: (a) The motive of self gain and (b) The act of concealment. The majority profess to believe that Elaine unjustly profited to the extent of, as they say, approximately $48,000 which she would receive during her life time or expectancy. I take it this would amount to a cash value of not more than $25,000.00. The alleged act of concealment consists of this: Mrs. Love, it is charged, wanted her estate to go directly to the educational fund created by her son and not the George R. Love Trust Fund, and that Elaine Love fraudulently concealed from Mrs. Love the fact that she [Elaine] would [under George R. Love's will] for her life receive the income from the George R. Love Trust Fund and also that Elaine's parents and her husband's parents would likewise share for life in the income from the same Trust Fund. The only logical deducible conclusion is that the majority believe Elaine was motivated by the desire for financial gain in committing the alleged fraud.

I respectfully submit that the record conclusively refutes (a) the motive and (b) the fraudulent act of concealment.

(a) There was no such motive. It is not disputed that Mrs. Love on June 24th [three days before the questioned will was executed] executed a will in her own handwriting. It is not and can not be contended

that this will of the 24th was the result of undue influence or fraud on the part of Elaine, because Mrs. Love, at that time, was in Rogers, Arkansas and Elaine was in Wisconsin. It is pointed out by the majority the June 24th will left Elaine more money [approximately twice the cash value] than she gets under the June 27th will.

(b) There was no fraudulent concealment by Elaine. In the case of *Green* v. *Bush,* 203 Ark. 883, 159 S. W. 2d 458, at page 887 of the Arkansas Reports, this court said: "This is a suit to cancel a deed upon the ground that its execution was procured by fraud; which is never presumed, but must be affirmatively proved by testimony which is clear and convincing." I propose to now show by the record that it not only does not reveal any "clear and convincing" evidence of fraud on the part of Elaine, but that it shows conclusively that she did not commit any fraud.

Contained in the record is a copy of a Wisconsin newspaper, properly introduced in evidence, under date of June 18th, 1953. This paper contains an article on the front page entitled "Dr. Love's Will Provides U. W. Educational Fund." Under this heading, on the front page, is a paragraph about the George R. Love Trust explaining its provisions, from which I shall presently quote. One witness, Mrs. Mackey, testified positively and without contradiction that Mrs. Love had in her possession a clipping of this same article before she executed the will on June 27, that she knew its contents, that she was proud of what her son had done, "and she intended putting her money to the same purpose. [Record pages 647 and 649.]

This same newspaper article referred to above, after explaining that Dr. George R. Love had given approximately one-half of his estate to the Elaine Love Trust, reads: "Income from the other half, *the George R. Love Trust, will be paid to the widow [Elaine] during her life,* and upon her death, to any of the *couples' parents still living* at that time." [Emphasis supplied].

Thus it conclusively appears from the uncontradicted record that every item of information which the majority hold Elaine fraudulently withheld from Mrs. Love [inducing her to execute the June 27 will] was in the possession and knowledge of Mrs. Love when said will was executed by her.

With both the motive and the act of concealment being thus refuted by the record, it is beyond my comprehension to understand how the majority opinion can be justified.