YARBROUGH *v.* MOSES, EXECUTOR.

5-334                                      267 S. W. 2d 289

Opinion delivered April 12, 1954.

[Rehearing denied May 17, 1954.]

*Snowden, Davis, McCoy, Donelson & Myer* and *Wright, Harrison, Lindsey & Upton,* for appellant.

*Fred MacDonald* and *Sharp & Sharp,* for appellee.

WARD, J. This appeal presents only one issue: Does the evidence support the trial court's finding that William B. Folsom had the mental capacity to execute his will on November 21, 1949. There is no disagreement as to the applicable law, hence the issue is essentially one of fact.

Folsom died May 20, 1953, at the age of 85, seized of an estate of $108,735.75, approximately all of which was in cash. Previously, and about the same time he executed his will, he had deeded his home in Brinkley to that City for a public library. With the exceptions of a few small bequests to individuals Folsom, by his will, provided for

his estate to be used for the maintenance of the library to be established in his former home. The library was to be named after him and his wife, to be known as the ''Harriet M. and William B. Folsom Library.'' The deceased and his wife had lived in Brinkley over 40 years until her death in 1948. During a large portion of this time he was engaged in running a newspaper and was active in civic affairs. He and his wife never had any children, and his closest heirs were the appellants, a nephew and niece. Before setting out the bequest for the library the will provides for the following bequests:

1. Jack W. Yarbrough, Memphis, Tenn. (appellant) ........................................................................................$2,000;

2. Miss Ellen Jones Yarbrough, Wynne (appellant) ........................................................................................$1,500;

3. Miss Jennie Folsom, McCrory (an aunt)............$ 800;

4. Mrs. Maggie Folsom, Memphis.............................$ 500;

5. Reverend O. C. Harvey................................................$2,000;

6. (Certain items of furniture to Hamilton Moses, executor, which were declined).

The will was witnessed by John F. Cole, vice president of the Bank of Brinkley where the deceased did most of his banking business and by Robert Moore, now vice president of the First National Bank of Springdale, Arkansas, but cashier of the Bank of Brinkley in 1949. Both of these witnesses testified that the testator had the mental capacity to execute his will on November 21, 1949, and that there was nothing strange or unusual in his demeanor on that occasion. Both witnesses stated they had known the deceased for something like thirty years, that they had observed his business dealings, and that they observed no impairment of his mind or business ability until he became ill two or three years after the will was executed. These two witnesses were corroborated by several other citizens of Brinkley and business acquaintances of the deceased, including Hamilton Moses who wrote the will, each one detailing their conversations and

dealings with the deceased before and after the date the will was executed.

It would serve no useful purpose to set out the testimony of all of the witnesses on behalf of appellee tending to show William B. Folsom had sufficient mental capacity to execute his will on November 21, 1949. In view of the fact that appellants were unable to produce any substantial testimony bearing on the deceased's testamentary capacity as of that date it suffices to say here that the record discloses ample testimony to support the conclusion that the deceased did have testamentary capacity when he executed the will. The only question remaining is: Is the testimony produced by appellants' witnesses to the effect that the deceased lacked testamentary capacity at certain times some months before and after November 21, 1949 sufficient to overcome appellee's testimony, or, in other words is it sufficient to justify us in holding that the decision of the trial court in favor of appellee is not supported by the weight of the evidence? After a careful review of the voluminous testimony on the part of appellants we have concluded that the question posed above must be answered in the negative.

During the latter part of January 1949 the testator became ill and was sent to the Baptist Hospital in Little Rock where he remained for treatment until about the middle of February of the same year. The doctor's diagnosis showed he was suffering from a bronchial condition and also from arteriosclerosis, that he had fever as high as 103 degrees and was at times confused and disoriented. It is not clear whether his state of confusion was caused by his temperature or other conditions mentioned above. At that time he was 79 or 80 years old and there were circumstances indicating that he was affected by senile dementia. However when he was discharged the doctor stated that he was "perfectly clear mentally."

Beginning during the latter part of 1951 there were definite signs that the testator was in poor health and that he was in need of someone to take care of him, partially because of his mental incapacity and partially be-

cause he was living by himself and had no one to look after him. This condition appeared to grow worse and on October 27, 1952 he was adjudged incompetent and a guardian was appointed. He remained in this condition until he died on May 20, 1953. There is much testimony by appellants, in sharp conflict with testimony offered by appellee, indicating that the testator was far from normal at certain periods of time before and after the will was executed. Appellant Yarbrough testified: I am 48 years old, live at Memphis, am a nephew of the deceased, and have kept in close touch with him through the years; after the deceased was released from the Baptist Hospital in February of 1949 I had occasion to pass through Brinkley and would stop off to see him, he visited me and my family in Memphis during that year and often expressed love and admiration for my wife, our little girl and myself; prior to the death of testator's wife he was well dressed and quite a neat man but his condition changed after her death in March of 1948 when he wore old clothes that needed mending and pressing; his physical and mental decline began approximately at the death of his wife and became progressively worse; when he came to see us in Memphis he would generally ride the bus and come by himself, he wouldn't always come when he said he would, and on most of these occasions he was quite confused and didn't know what was going on; he was an individualist, a strong willed man and very determined in what he wanted to do; he drove a car during 1949 and part of the time he lived by himself; and, in my opinion at no time during the year 1949 was he mentally competent to make a will because he never seemed to be able to grasp anything and keep it in his mind long enough to make a decision. Introduced in evidence, as exhibits to witness' testimony are nine letters written by deceased to witness or his wife, two of which were written in April 1949, two in May 1949, and five in November 1949. The last three letters were dated November 19, November 23 and November 25, and all of the letters are written in the testator's handwriting. The letters appear to be sensibly composed and almost uniformly they expressed love and affection. From these

letters and other testimony it appears that they had under consideration a plan whereby the testator would advance something like five or six thousand dollars to help Jack Yarbrough and his wife provide a suitable home in Memphis in which they would all live.

The testimony of Mrs. Jack Yarbrough did not go into as much detail as that of her husband but was substantially to the same effect.

A number of other witnesses, friends and neighbors who lived in Brinkley, testified to numerous conversations and incidents which tended to indicate that the deceased was not normal during 1949 and 1950. One who had almost daily contact with the deceased noticed a mental and physical change in him after the death of his wife in 1948 and didn't think he was competent to make a will. One lady who lived next door to the deceased for eight years and had almost daily contact with him says that in 1949 he would often lose the keys to his house or would leave them inside the house; she stayed with the deceased and was supposed to receive $175 a month but only got $30; and the deceased did not buy groceries because he said he didn't have the money, and he could not at all times retain in his memory without prompting the nature and extent of his possessions, sometimes he could and sometimes he couldn't. Mr. Malham who operated a hotel at Brinkley just one block from Folsom's home had casual contact with him; Folsom often bought sandwiches and drinks at his place and was never out of order; he had no reason to believe Folsom was incompetent in 1949. Mr. Clifton began working for Folsom in 1921 as a "printer's devil," purchased an interest in the paper in 1943 and continued as a joint owner with Folsom until March 21, 1948 when he purchased Folsom's interest after the death of Mrs. Folsom. Witness saw Folsom frequently from January 1949 to November 21, 1949 and thinks he did not have a good mental condition; he observed a marked change in his physical and mental condition after the death of his wife; prior to his wife's death Folsom was neat and clean but afterwards he was ragged; Folsom never smoked or drank prior to the

death of his wife, he operated on a cash basis and took all discounts. Witness knows that when Folsom deeded his home place to the city he got the description wrong and attempted to convey a portion which he did not own and which he had formerly deeded to him (the witness). Mrs. Stone lives in Memphis and was a cousin of Folsom; she discussed investments with Folsom prior to his wife's death; on one occasion she came to Brinkley at his suggestion to help him make a list of his holdings so he could get his business straightened out; he didn't seem to be able to give her any accurate information; she saw him two or three times in Brinkley in 1949 and had conversations with him and does not think his mental condition was very clear on Christmas day of 1949. Mrs. Mary Thompson lives in Memphis and was a cousin of Folsom; she saw him at Christmas time in 1949 when he came to Memphis; she and Folsom carried on considerable correspondence but when she told him something he would answer as if he did not understand; she called him on November 24, 1949 to ask him to come and eat Christmas dinner but he was not at all well and didn't seem to understand; and in her opinion he did not have mental capacity to transact business or to execute the will. H. L. Cooper, 31 years old, has lived at Brinkley for 27 years, has been engaged in grocery business for eleven years and knew Folsom who traded at his store; he thinks Folsom was a little bit eccentric and unusual all the time he knew him; he was stingy although everybody knew he had lots of money and he was always saying he couldn't afford things; on one occasion in 1950 Folsom gave him a check for $85 when he only owed 85 cents but had never had any similar difficulty before that time. Marie Graves, a practical nurse employed by Dr. Dalton, has lived in Brinkley 25 or 30 years; she nursed Mrs. Folsom for two or three weeks before she died and has never been paid for her services although she tried to collect from Folsom. There is other testimony of a like tenor. John B. Thurman, an attorney of Little Rock, as a representative of an insurance company, represented Folsom in a lawsuit which involved a car wreck; the wreck occurred in 1948 and the suit was tried in June

1949; before trial he went to Brinkley to talk with Folsom about the wreck and to contact an eye-witness which Folsom was to furnish; he talked about two hours with Folsom and had great difficulty in securing satisfactory information; finally Folsom produced a negro who was supposed to be an eye-witness but actually was not and knew nothing about the wreck. When pressed for an answer to what he thought of Folsom's mental capacity to execute a will Thurman stated: "At the end of two hours talking to him [Folsom] in his home I was still unable to get him to talk about the accident and I reached the definite conclusion right then his mental condition was such that I doubted the advisability of putting him on the stand."

Appellants introduced the testimony of two doctors. Dr. Smith who has practiced in Little Rock about 25 years treated Folsom at the Baptist Hospital in Little Rock from January 30th through February 15, 1949. His hospital record shows a diagnosis of acute upper respiratory infection and acute thrombosed hemorrhoids. He found the patient to be 80 years old, disoriented and history not reliable, fairly cooperative and mentally confused. Another diagnosis was bronchial pneumonia, generalized arteriosclerosis and thrombotic hemorrhoids. The patient's chart showed temperatures ranging from 96 degrees to 103.40 degrees. The last notation made on February 15, 1949 reads "condition satisfactory, perfectly clear mentally. General physical condition is excellent. To go home today or when ready." In the doctor's opinion Folsom's confusion and disorientation was precipitated by respiratory infection and that the background would be his age and the general cycle of his becoming mentally aged. The doctor stated that sloppiness in dress, disregard of traffic hazards, anxiety about finances are indications of mental deterioration, and all of these symptoms are typical of arteriosclerotic changes; and that loss of memory and interest in surroundings is also a symptom of senile psychosis and arteriosclerosis. The doctor stated further that X-ray is important in a diagnosis of this kind and that Folsom's X-ray report

showed: "The most marked change however is seen in the aorta as there is quite a marked aneurysmal dilatation of same." When Folsom left the hospital he was, according to the doctor, normal for a man 80 years of age.

Dr. Howard A. Boone, a graduate of the University of Tennessee medical school in 1944, treated Folsom at the Wallace Hospital in Memphis between the dates of October 28, 1952 and March 24, 1953 and saw him daily. His diagnosis was cerebral arteriosclerosis, arteriosclerotic heart disease, and benign prostatic hypertrophy. In his opinion Folsom was a senile individual who was disoriented and incompetent; that his mental condition might have come about recently after a complete occlusion of one of the larger vessels of the brain but was of the opinion that it came about over a considerable period of time as a gradually advancing process.

In rebuttal to the above testimony on the part of the appellants, appellee introduced approximately a dozen witnesses who had known Folsom intimately for years, and particularly during the years 1948 to 1953. Many of these witnesses had numerous conversations along business lines with him shortly before and after the will was executed. They were all of the opinion that during 1949 and part of 1951, excepting the time he was in the Baptist Hospital at Little Rock, Folsom was fully competent mentally to execute the will and that he actually looked after business affairs and took care of himself as any normal man of his age. According to these witnesses Folsom and his wife had for years planned to give their home and their property to the city of Brinkley for the purpose of establishing a memorial library.

As previously stated, the only issue before us is whether William B. Folsom had mental capacity to execute his will on November 21, 1949. While this issue presents primarily a question of fact or a weighing of the evidence, there are certain well defined applicable rules of law, a consideration of which will assist in a proper determination of that issue.

This court has many times defined the *quantum* of mental capacity necessary for a testator to have in order to make a valid will. Briefly stated it is generally said that a testator must have a sound mind and disposing memory.

This definition is generally broken down into three subdivisions and testamentary capacity is more fully defined as the ability on the part of the testator (a) to retain in memory without prompting the extent and condition of the property to be disposed of; (b) to comprehend to whom he is giving it; and (c) to realize the deserts and relations to him of those whom he includes in or excludes from his will. *Shippen* v. *Shippen,* 213 Ark. 517, 211 S. W. 2d 433; *Scott* v. *Dodson, Executor,* 214 Ark. 1, 214 S. W. 2d 357; and *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405. We have many times held that it is not necessary to show that the testator actually had in mind all the details concerning his property at the time he makes a will but that he had the capacity to know and comprehend the nature and extent. In *Emerich* v. *Arendt,* 179 Ark. 186, (at page 188) 14 S. W. 2d 547, it was stated: "The question is not whether the testator did actually appreciate the deserts of and relation to him of the one excluded but whether he had, at the time, the capacity to do so."

In *Shippen* v. *Shippen, supra,* we said: "The burden of proof in cases of this kind is on the contestant, who asserts the mental incapacity of the testator," and this rule had been announced many times previously.

While old age and physical fitness are proper matters to be considered in an effort to determine one's testamentary capacity yet this court has said many times as was said in *Griffin* v. *Union Trust Company,* 166 Ark. 347, (at page 356) 266 S. W. 289, that:

"Old age, physical incapacity and partial eclipse of the mind will not invalidate a will if the testator has sufficient capacity to remember the extent and condition of his property without prompting, to comprehend to whom he is giving it, and be capable of appreciating the

deserts and relation to him of others whom he excluded from participating in his estate. He is not required to do all these things, but should have capacity to do them."

It has also been consistently held by this court, as was stated in the case of *Scott* v. *Dodson, supra,* that the testator's mental capacity must be adjudged as of the time when his will is executed. It is true of course that testimony of the testator's mental capacity for a reasonable time before and after the execution of the will is ordinarily, as in this case, competent evidence to show what his mental capacity was at the time the will was executed.

When we consider the testimony in behalf of appellants and the appellee, as outlined above, we are driven to the conclusion that the weight of the evidence sustains the trial court's finding to the effect that William B. Folsom had sufficient mental capacity to execute his will on November 21, 1949.

The weight of the evidence shows that the testator in this instance had many times expressed the intention of giving the bulk of his property to establish a library for the town of Brinkley, that he fully comprehended the extent and condition of the property which he owned; that he knew to whom he was giving it; and that he fully realized the relation which he bore to appellants and their natural claim to his bounty. We cannot say that the devises contained in William B. Folsom's will are indicative that he did not act as a normal and reasonable person. We recognize that many of the testator's statements and actions before and after November 21, 1949, particularly when standing alone without any explanation which he might have been able to make if alive, appear strange and eccentric but we are unable to say that they overcome the direct testimony that he was mentally competent to execute his will at the time he did so.

Affirmed.