O'DELL *v.* NEWTON.

5-1519                                                         312 S. W. 2d 339

Opinion delivered April 21, 1958.

*Byron Bogard* and *Bobbie Jean Farabee,* for appellant.

*Willis V. Lewis,* for appellee.

J. SEABORN HOLT, Associate Justice.   This appeal is from a decree of the Pulaski Probate Court voiding the will of J. F. Farmer, deceased, on the ground that the testator lacked mental capacity to make the will. The sole question presented is whether the finding of the trial court, that J. F. Farmer lacked mental capacity to make his will, was against the preponderance of the evidence.   After a careful review of all the testimony, we have concluded that appellant's contention that the findings and decree of the trial court were against the preponderance of the testimony must be sustained.

The record reflects that J. F. Farmer executed the will in question while living with his daughter, Sarah O'Dell, appellant, at her home in Texas, September 7,

1950. He was survived at his death by two daughters, appellant (Sarah) and appellee (Lillian Newton) of Little Rock. For a great many years Farmer had lived in North Little Rock, was an employee of the Cotton Belt Railroad until his eyesight began to fail in 1934, retired in 1941 and thereafter became almost totally blind. For a period of about ten years he and his wife lived in North Little Rock alone, or until July 1949, when their daughter, Sarah, took them to Texas and into her home where she cared for them until their deaths. Mrs. Farmer died in 1949 and Mr. Farmer January 23, 1953.

About fourteen months after his removal to Texas, Farmer executed the will in question which (among others) contained this provision: "I give to my beloved daughter, Sarah Lura O'Dell, all the property, real, personal or mixed, which I may own at the time of my death. The foregoing bequest to my daughter Sarah Lura O'Dell is made because of her love and loyalty to me and to my deceased wife, Rosa Lee Farmer, who was her mother. She gave to her mother during her last years and during her last illness, tender and constant care and she has given me the same kind of tender care and affection since I have lived in her home. In making this bequest it is not my will and desire to offend my other daughter, Lillie Newton, but such bequest is made by me in order to express my appreciation as well as to partly compensate my daughter Sarah, for what she has done for me." It appears that all of Farmer's property was of a value of approximately $4,000.

The law is well settled in this state that the burden of proof, in cases such as the one presented here, is always on the contestant who asserts the mental incapacity of the testator. "While old age and physical fitness are proper matters to be considered in an effort to determine one's testamentary capacity yet this court has said many times . . . that 'Old Age, physical incapacity and partial eclipse of the mind will not invalidate a will if the testator has sufficient capacity to remember the extent and condition of his property

without prompting, to comprehend to whom he is giving it, and be capable of appreciating the deserts and relation to him of others whom he excluded from participating in his estate. He is not required to do all these things, but should have capacity to do them.' It has also been consistently held by this court, . . . that the testator's mental capacity must be adjudged as of the time when his will is executed. It is true of course that testimony of the testator's mental capacity for a reasonable time before and after the execution of the will is ordinarily, . . . competent evidence to show what his mental capacity was at the time the will was executed." *Yarbrough* v. *Moses, Executor,* 223 Ark. 489, 267 S. W. 2d 289.

It appears undisputed that Farmer was old and infirm and for sometime before moving to Texas it appeared to witnesses introduced by appellee that while he lived in North Little Rock, at times he acted "silly", "talked like a kid", that it was common knowledge that he had kinda' lost his mind, did not know what he was doing half the time, and in their opinion was incapable of transacting business. Appellee produced only one witness who saw and visited with testator after he moved to Texas. This witness, William Newton (Farmer's grandson) testified that he saw Farmer in February 1951 at Sarah O'Dell's home at Tyler, Texas, and spent about an hour with him. That his grandfather did not recognize him.

Appellant, Sarah O'Dell, testified that her father died at her home on January 23, 1953, and was buried in Tyler, Texas, with her mother. That her mother was living with her at the time of her death and that she took them to her home in 1949 and cared for them, and that her father made his will after being in her home over a year. He was under the doctor's care and that his health had greatly improved, that her father brought up the subject of making his will and asked her to call Judge Powers, her attorney. Judge Powers came out, talked to her father, went back and later, at her father's request returned. Judge Powers

called Dr. Bundy who came out and visited with her father. Dr. Bundy made another visit several months later. Judge Powers drew the will and her father signed it in her home before two neighbors. She testified that her father was rational and knew what he was doing. He was 75 years old when he died, that he was able to dress himself and intended to vote in the coming November election. He expressed the feeling to her that — they were going to put something over on him in Little Rock and later told her that LeRoy, his grandson, tried to make him sign a will before he came to Texas. She further testified that William Newton came to her home in 1951 and talked to her father about an hour. At the time he came her father was listening to a football game over the radio, recognized Newton and called him Bill and shook hands with him. After Bill left her father expressed some anxiety as to the purpose of his visit — he felt that Bill came down to see him so he could testify that he was crazy. Her father grew better after coming to her home and got where he could talk as good as anyone. He died suddenly from a heart attack, and knew pretty well what he was doing up to a day or two before he died. He was very fond of her son who was at Baylor. It was quite awhile after her mother died before her father started talking about a will. After the will was executed it remained in Judge Power's office until her father's death.

Appellant's husband, W. D. O'Dell, railroad clerk for the Cotton Belt in Tyler, Texas, 63 years old, testified that while Mr. Farmer had difficulty with his speech when he executed the will his mental thinking was good, remembered dates, days of week without a calendar and took care of himself; that Judge Powers drew the will and Farmer was ''absolutely'' rational at the time he executed it. ''Q. . . . what would he (Farmer) do for diversion? A. He loved ball games and he loved singing and loved religious services. On Sunday morning he would turn his radio on and get his favorite preacher and listen to him and turn and get another; all day Sunday he would listen to religious services. Q.

Would that be every Sunday? A. Yes, and on Sunday when they were playing ball he would listen to it and every once in a while he would yell out.''

Dr. Bundy, physician, county health officer for 18 years, testified: ''Q. State here your opinion as to his mental condition of September 7, 1950, if you know. And in giving your answer to this question state whether you base the answer on your professional treatment of him or otherwise. The question, of course, refers to J. F. Farmer, now deceased. A. Based upon my examination and observation of him, it was good. This opinion is given, based upon the several visits I made to Mr. Farmer's home for the purpose of observing him and treating him, if necessary. I found that no treatment was necessary. That for a man his age and with the physical impairment he had that his mind was good and in my opinion he had the mental capacity to handle his own affairs. Q. State whether or not the said J. F. Farmer, in your opinion, based on what you have already stated as your means of knowledge of his condition, was capable of thinking rationally and making his last will and testament on September 7, 1950? Explain your answer if you will. A. In my opinion J. F. Farmer, on September 7, 1950, was capable of thinking rationally and was capable of making his last will and testament. I examined Mr. Farmer on several occasions very carefully and remember on one occasion, during the late summer of 1950, spending more than an hour discussing with him many things, among others, some of his plans and he, in my opinion, was thoroughly capable of making a will and knowing and understanding what he was doing and what he wished to do. All of his expressions and discussions were logical and rational and he was an interesting man to converse with.''

As indicated, we are primarily concerned with Farmer's mental capacity at the time he made the will. Appellee has offered only one witness (William Newton, Farmer's grandson) who even saw Farmer and talked to him after he left Arkansas and went to live with appellant in Texas, and then only for about one hour in

February 1951, about six months after the will was executed. On the whole, as indicated, we think it clear that appellee failed to sustain the burden of proof imposed on her to establish the mental incapacity of the testator. See *Shippen* v. *Shippen*, 213 Ark. 517, 211 S. W. 2d 433.

The decree is reversed and the cause remanded with directions to uphold the validity of the will, and for further proceedings consistent with this opinion.

ROBINSON, J., dissents.

SAM ROBINSON, Associate Justice, dissenting. It was the opinion of the trial judge who saw the witnesses and heard the testimony that Mr. Farmer was not competent to make a will, and in my opinion the preponderance of the evidence sustains that view.

Mr. Farmer was a resident of North Little Rock for many years. In the early 30's he lost his eyesight, and the evidence shows that as early as 1941 he began to deteriorate mentally. In 1949 he and Mrs. Farmer went to live with their daughter, Mrs. O'Dell, in Tyler, Texas. During that year Mrs. Farmer fell at the back steps of her home in North Little Rock and broke her hip. The record is not clear on this point, but it appears that Mrs. Farmer had been to Texas and had returned to North Little Rock when she received the injury. In any event, she and Mr. Farmer were at Mrs. O'Dell's home in Texas when Mrs. Farmer died in November, 1949. The following spring Mrs. O'Dell called her lawyer to draw Mr. Farmer's will, but the lawyer did not write the will at that time. Instead, he called a doctor to examine into Mr. Farmer's mental condition. Certainly, no lawyer called to write a will would refuse to do it and call a doctor to give the testator a mental examination unless the lawyer suspected that the person whose will was to be written was mentally incompetent. Just what the doctor found Farmer's mental condition to be at that time is not shown by the evidence, but presumably Mr. Farmer was in no condition to make a will, because no will was prepared at that time.

Several months later someone, obviously an attorney, did draw a will, which leaves everything to Mrs. O'Dell. Mrs. O'Dell says that a Judge Powers drew the will and brought it out to her house; that Mr. Farmer signed it and the lawyer then took it back to his office. Mr. O'Dell, the husband of Mrs. O'Dell, says no lawyer was there when the will was executed. One of the witnesses to the execution of the will is Mrs. O'Dell's son-in-law; the other witness is the family barber. Neither was called in this case to prove Mr. Farmer's mental capacity. Nor was the lawyer who is alleged to have written the will called as a witness. To prove that the testator was of sound mind at the time of the execution of the will, the proponent of the will called only three witnesses. Two of these witnesses are greatly interested in the outcome of the litigation: Mrs. O'Dell is the sole beneficiary under the will, and, of course, her husband would like to see her win the case. The only other witness called to show the sanity of the testator was a doctor engaged to show Mr. Farmer to be sane. The doctor was called by Mrs. O'Dell to examine Mr. Farmer. There is nothing to indicate that she wanted to prove Mr. Farmer lacked the mental capacity to make a will. Moreover, the failure of the proponent of the will to call witnesses that must have been available speaks volumes. During the time Mr. Farmer was at Mrs. O'Dell's, he suffered with spells of some kind that caused him to lose consciousness for as much as 45 minutes at a time. Mrs. O'Dell had a doctor with him on these occasions; in fact, in the majority opinion it is pointed out that Mrs. O'Dell testified that while at her home Mr. Farmer was under a doctor's care and that his health had improved. No doubt it was highly significant to the Probate Judge that the doctor who Mrs. O'Dell says treated Mr. Farmer was not called to testify.

Mr. Farmer moved with Mrs. O'Dell in July, 1949. In the spring of 1950 she had him examined for will-making purposes; in the fall of 1950 the will was executed. Mr. Farmer continued to live with Mrs. O'Dell until the date of his death, January 23, 1953, and yet not one single visitor, neighbor or friend was called to show Mr. Farmer's mental capacity to make a will. The proponent

relied on the testimony of three witnesses only. Her own testimony and her husband's, and that of a doctor called under strange circumstances to give Mr. Farmer a mental examination.

To show Mr. Farmer's mental incapacity to make a valid will, friends and neighbors who had known him intimately over a long period of years testified that he began to lose his mind several years before he went to live with Mrs. O'Dell; that he had paresis; that it was generally known in the neighborhood that he had lost his mind; that he did not know what he was doing for a long time before he left North Little Rock; that his condition seemed to grow worse; that he was not rational; that he had a stroke in 1945 or 1946; that he talked like a child and did not know old acquaintances; that this condition existed at the time he left North Little Rock; that at the time Mrs. Farmer fell and broke her hip she cried for help, a neighbor answered her calls and asked Mr. Farmer what was the matter, but he did not answer her; that his mind was not right; that he did not know what he was talking about, and what he said did not make sense; that this condition existed from 1941 to the time he left here a few months before a doctor was called to examine his mentality; that he was not capable of transacting business; that in 1949 Mrs. Farmer had Mr. Farmer put in the County Hospital because she could not control him; and in 1951 he did not know his own grandson.

It appears to me that Mr. Farmer's mental incapacity to make a will is established by a great preponderance of the evidence. In fact, no disinterested witness, with the possible exception of one doctor, testified that Mr. Farmer had the mental capacity to make a will. I think the decree should be affirmed, and for the reasons set out herein I respectfully dissent.