SHORT *v.* STEPHENSON.

4-3189                                386 S. W. 2d 501

Opinion delivered February 8, 1965.

[Rehearing denied April 12, 1965.]

*Carneal Warfield,* for appellant.

*W. K. Grubbs, Sr.* and *O. C. Burnside, Sr.,* for appellee.

SAM ROBINSON, Associate Justice. Dr. A. G. Anderson of Eudora, Arkansas, a bachelor, died on the 15th day of June, 1960. He had signed a purported will on July 3, 1959. The will was filed for probate in the Chicot County Probate Court. Mrs. Helen Short of Louisville, Kentucky, a niece and only relative of the deceased, filed a petition contesting the validity of the will alleging that the testator did not have testamentary capacity, and that the will was procured by undue influence. After an extensive hearing the Probate Court admitted the will to probate. Mrs. Short has appealed.

The case is tried here de novo. *Sullivant* v. *Sullivant,* 236 Ark. 95, 364 S. W. 2d 665. Undue influence is defined as ''. . . not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property.'' *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590. *Shippen* v. *Shippen,* 213 Ark. 517, 211 S.W. 2d 433.

Where a beneficiary, under the terms of a will, procures the making of the will there is a rebuttable pre-

sumption of undue influence, and "it is incumbent on those, who, in such a case, seek to establish the will, to show beyond reasonable doubt, that the testator had both such mental capacity, and such freedom of will and action as are requisite to render a will legally valid." *McDaniel, Adm.* v. *Crosby, et al.,* 19 Ark. 533; *Orr* v. *Love,* 225 Ark. 505, 283 S. W. 2d 667.

This court said in *Phillips* v. *Jones,* 179 Ark. 877, 18 S. W. 2d 352:" . . . the questions of testamentary capacity and undue influence are so interwoven in any case where these questions are raised that the court necessarily considered them together (*St. Joseph's Convent* v. *Garner,* 66 Ark. 623, 53 S. W. 398), for in one case where the mind of the testator is strong and alert the facts constituting undue influence would be required to be far stronger in their tendency to influence the mind unduly than in another, where the mind of the testator was impaired, either by some inherent defect or by the consequences of disease or advancing age."

In the case at bar, when undue influence is considered in connection with the lack of mental capacity, undoubtedly probate of the will should be set aside.

Although we have reached the conclusion that the will was procured by undue influence, we do not dwell on that point because we find by a preponderance of the evidence that the testator did not have the necessary testamentary capacity to execute a valid will.

Testamentary capacity means that the testator must be able to retain in his mind, without prompting, the extent and condition of his property, to comprehend to whom he is giving it, and relations of those entitled to his bounty. *Tatum* v. *Chandler,* 229 Ark. 864, 319 S. W. 2d 513; *Sullivant* v. *Sullivant,* 236 Ark. 95, 364 S. W. 2d 665; *O'Dell* v. *Newton,* 228 Ark. 1069, 312 S. W. 2d 339.

The evidence must be examined in the light of the aforesaid principles of law.

Dr. Anderson, the testator, was born and reared in Kentucky, but he spent practically his profession as a

physician until he retired from active practice several years ago. He was 89 years of age at the time he executed the alleged will.

Dr. Anderson left an estate valued at about $118,000. The purported will makes specific bequests totaling $9,-400.00. All the rest and residue of the estate, according to the terms of the alleged will, goes to Robert Stephenson, one of the proponents of the will. Mr. Stephenson was not related to Dr. Anderson, but was an old friend. He was present with Dr. Anderson in a lawyer's office in Lake Village (both Dr. Anderson and Mr. Stephenson lived at Eudora) when arrangements were made for the preparation of the will. He was also present at the home of Dr. Anderson in Eudora on July 3, 1959, when Dr. Anderson signed the alleged will. Mr. Stephenson called the ones with whom arrangements had been made to witness the will and reminded them to be at Dr. Anderson's home on the morning of July 3, 1959 to sign as witnesses. Actually, he picked up one of the witnesses in his car and drove her to Dr. Anderson's home where the doctor lived alone.

The record in this case is large, consisting of about 1,200 pages, but due to the difference of opinion among the lawyers for the parties as to what constitutes a fair abstract of the evidence, we have examined the entire record and have reached the conclusion that a preponderance of the evidence proves that Dr. Anderson did not have the testmentary capacity required by law to execute a valid will.

Not only does the evidence support a hypothetical question propounded to an expert witness by counsel for the contestant, but practically all of the facts mentioned in the hypothetical question are proved by a preponderance of the evidence. This evidence, along with other evidence in the case, proves that at the time of the execution of the will Dr. Anderson was not mentally competent to make a valid will. To abstract here all the evidence in the case would unduly extend this opinion, but we point

to the facts proved by the evidence and mentioned in the hypothetical question.

Early in 1956, Dr. Anderson bought three head of cattle from John Crabtree and forgot all about them; in the Spring of 1956, he bought a very expensive bull for which he had no need. There were several incidents during the years 1957 and 1958 showing complete loss of memory of various transactions. On April 25, 1958, he sold several hundred acres of land and on April 30, 1959 he was unable to remember any terms of the sale. For some 20 years Dr. Anderson was deathly afraid of snakes and always carried a hoe in his car and would never walk through grass or crops without this protection; in June, 1958, he forgot all about snakes and never carried his hoe again.

In the Fall of 1958, Dr. Anderson bought two loads of corn and when it was delivered, he had the man take it back. Shortly thereafter, he sent Joe Hardeman to the same person to buy the same corn at the same price. He made several loans to persons whose names he could not remember. The Saturday afternoon before Christmas, 1958, Dr. Anderson voided off the front porch of his office on Main Street, and gave no sign that he recognized Lee Scott, who had knocked on his porch and caused him to come out of his office. In 1956 and 1957, Edgel Burgess negotiated with Dr. Anderson for the purchase of a piece of property and he forgot about the transaction within a short period of time.

For several years prior to 1958, Dr. Anderson employed Charles Wade to farm and raise cattle for him with the agreement that he pay Wade a small salary, but Wade would share in the profits of the farm and cattle operations. In 1958 he sold cattle and land to Frank Pylate without consulting Wade and forgot all about their agreement that Wade was to share in the profits. In the Spring of 1959, he refused on one occasion to make a loan that he had promised to Lee Scott, and a short time later he met Scott on the street, took him to his office, made

the loan, and didn't remember having refused it less than an hour before.

On April 11, 1959, Dr. Anderson failed to recognize his only living relative, his niece, Mrs. Helen Short. He also failed to recognize several other people whom he had known well over a long period of years. During 1958 and 1959 he was continually forgetting where he left his automobile; he would also forget when he had eaten and return in a short time thinking he had not eaten, and would eat again. On at least two occasions in June, 1959, he went into a restaurant at 8:30 in the evening and asked for breakfast and could not be made to realize that it was not early in the morning.

During the last ten years of his life, Dr. Anderson talked more and more of events that happened in the remote past and seemed unable to remember recent and intermediate events. Late in 1958 and early in 1959, he forgot old events that he had so often recounted in the past; he forgot his birthday on January 25, 1959, although he had celebrated it at a special dinner each year for many years and had always enjoyed it. There was also considerable change in personal appearance and habits; his irrationality increased markedly, such as throwing coffee at a waitress, walking out and refusing to eat, and getting angry when someone would try to help him in other ways.

He lost interest in things in general; his interest centered more and more on himself. He suffered from nocturnal restlessness; he became difficult and sometimes impossible to understand while talking. He appeared to be talking either to himself or some imaginary person; there was a definite change in his speech, it became slower and more difficult. He suffered more and more from tremors and agitation during the last few years of his life; his judgment became seriously impaired; his driving became hazardous; he failed to observe traffic signals or take reasonable precautions to protect his life or the lives of others; he unnecessarily drove his car into mud holes.

During the latter part of 1958 and the early part of 1959, Dr. Anderson's physical condition became steadily worse. His appetite decreased and he became very weak and feeble; his posture became stooped. It was necessary for him to be hospitalized five times during the first four months of 1959; by July 3, 1959, he was 89 years of age and had become so weak and emaciated that he had to be helped up and down stairs and it was often necessary to feed him with a spoon.

On the morning of July 3, 1959, at 7:30 o'clock, Dr. Anderson was unable to talk, and appeared to be disoriented to the extent that he didn't realize where he was or what he was doing; he was unable to eat and unable to recognize people whom he had known for years.

Dr. W. P. Holman, a qualified neuro-psychiatrist at the Arkansas State Hospital, testified that, in his opinion, as far back as 1958 Dr. Anderson suffered with senile psychosis. He further testified that when a person is suffering with senile psychosis his defect in judgment is permanent and is not transitory; that when one is afflicted with this condition he is out of contact with his surroundings and there is a disturbance in a person's relation to reality; that once he is incompetent from senile psychosis he remains that way; that Dr. Anderson would not be capable of realizing the nature and extent of his property or his obligation to those who were most entitled to his bounty, and would not be capable of carrying on business and realizing the nature and consequence of his actions; that he would not be mentally competent to do those things; that his memory would be impaired so severely he would not know his natural heirs and his judgment would be impaired.

In addition to the foregoing facts, there are other facts supporting the conclusion that Dr. Anderson did not have testamentary capacity. The record is convincing that he was a good man, a fair-minded man; that before he became afflicted with senile psychosis he could be counted on to do the right thing.

Joe Hardeman, an old negro, 73 years of age at the time Dr. Anderson executed the purported will, had worked for the doctor for 32 years. The evidence is convincing that he had been loyal and faithful to Dr. Anderson. Many many nights, when Dr. Anderson was very sick, Old Joe sat up all night long in the room with the doctor to keep the fire burning and to help in any manner required. In fact, he sat up with the doctor so many nights that it was suggested that a cot be placed in the doctor's room for the old negro to make it a little easier on him. Joe was never paid for this kind of service.

By the so-called will, Dr. Anderson left Joe only two old mules that are practically worthless, one of them being over 30 years old, and the so-called will also provides for the cancellation of any debts that the old negro might owe the doctor. Joe did not owe anything of any consequence. He "paid out" every year. From the record it does not appear that such ingratitude was the act of the just and fair-minded man that Dr. Anderson was before he became afflicted with senile psychosis.

The testator's physical and mental condition for months immediately preceding the execution of the so-called will supports the conclusion that he did not have testamentary capacity. On January 25, 1959, Dr. Anderson was admitted to the Greenville, Mississippi, hospital. Appellee made an objection to the admission in evidence of the hospital records, but from the record on appeal it is not clear as to just what portion of the hospital records appellee objected. The records were introduced by the attending physicians—the ones who made the diagnoses. The doctors had written out the diagnoses in the records in their own handwriting and had signed the records. The attending physicians were on the witness stand; they could have been cross examined on any phase of the records, and if it developed that the records contained matter of which the witnesses had no personal knowledge, a motion could have been made to strike that specific part, which motion may or may not have been granted, but there could be no valid objection to that part

of the records made by the witnesses. Ark. Stat. Ann. § 28-928 (Repl. 1962).

The diagnosis on January 25, 1959, when Dr. Anderson was admitted to the Greenville Hospital was "general arteriosclerosis". He was discharged from the hospital two days later on January 27, 1959. Less than a month later, on February 17, 1959, he was admitted to the hospital at Lake Village; the diagnosis was "arteriosclerosis and senility". He was discharged five days later on February 22, 1959. Again, about a month later, on March 25, he was admitted to the Lake Village Hospital; the diagnosis was "myocarditis, senility . . . very feeble senile male". He was discharged four days later on March 29, 1959. Again less than two weeks later, on April 9, 1959, he was admitted to the Lake Village Hospital; the diagnosis was "senility, frail, senile male— very weak". He was discharged the next day, April 10. In less than two weeks, on April 19, he was again admitted to the Greenville Hospital; the diagnosis was "arteriosclerotic heart disease—digitalic intoxication". He was discharged April 30, 1959. He signed the purported will about two months later on July 3, 1959.

Although appellee introduced evidence tending to prove that Dr. Anderson was mentally capable of making a valid will, we are of the opinion that the preponderance of the evidence is to the contrary. The judgment is, therefore, reversed with directions to set aside the probate of the will.

Harris, C. J., McFaddin & George Rose Smith, J. J., dissent.

Carleton Harris, Chief Justice (dissenting). I am unable to agree with the result reached by the majority. To set out the testimony on either side would take many pages, and it is only my purpose to point out that there was much evidence to the effect that Dr. Anderson was mentally competent.

Dr. Lewis Farr of Greenville, Mississippi, attended Dr. Anderson in January and April of 1959, when the latter was a patient in the hospital in Greenville, and also saw him in April of 1960. Dr. Farr stated that he could not state, from his diagnosis, that Anderson was mentally incompetent in July of 1959. Of more significance, I think, is the testimony of Dr. B. Z. Binns of Eudora, who was Anderson's doctor from 1952, and particularly treated him during 1958, 1959 and 1960. He testified that he never saw Dr. Anderson at any time when the latter was psychotic, and it was his opinion that the testator was mentally competent on July 3, 1959, the date of the execution of the will. To me, this testimony is much more pertinent and persuasive than that of Dr. W. P. Holman, the expert who answered the hypothetical question, for the reason that Dr. Binns was well acquainted with Anderson in his lifetime, seeing and treating Anderson on many occasions, while Dr. Holman never saw the testator at all.

L. B. Hunter, an employee of the Eudora Hardware Company, a friend of Anderson's for a long number of years, and who had occasion to see him often, stated that he never once saw the doctor do or say anything that indicated mental incompetence, and he was of the opinion that Anderson was competent in July, 1959. Frank Pylate testified that the doctor told him that when he (Anderson) died, he was going to leave his affairs in the hands of Robert Stephenson. He was of the opinion that Anderson was mentally competent on July 3. Mrs. Edith Wilson testified to the same effect; W. R. Jones, executive officer of the Eudora bank (of which Dr. Anderson was a director) testified that during 1959, the doctor was at every directors' meeting, and that he took part in the meetings, apparently fully aware of what was going on, asking questions, and making comments. He stated that Anderson did not say or do anything that indicated mental incompetence, and he was of the opinion that the doctor was mentally competent in July of 1959. In fact, the record reflects that Dr. Anderson attended a directors' meeting on July 8, five days subsequent to

execution of the will, here in question, and on that date made a loan to Mrs. Carlton, one of the appellant's witnesses.

S. H. Ball, Constable at Eudora, R. C. Grubbs, Chief Clerk of the Post Office, Ralph Scott, another director of the Eudora bank, Reverend John T. Miles of Scott Memorial Methodist Church in Eudora, R. W. Parrish, former Crcuit Clerk of Chicot County, Mrs. Ruby Cain, who worked in a store close to Anderson's office, Mrs. George Cochran, a clerk at the Catron-Gay Funeral Home, and several others, all testified that they had occasion to see Anderson several times during 1959, and it was their opinion that the doctor was competent on July 3 of that year. Rather than detail the testimony of the various witnesses, I set forth a part of the findings of the Chancery Court of Chicot County relative to the activities of the doctor. From the findings of the court:

"The business activity of the decedent from March 1958, to March 1960, shows the following: March 13, 1958, transferred some $70,000.00, the residue of his sister's estate to contestant; April 25, 1958, sold his 349 acre farm and herd of cattle for $48,000.00, the deferred payments on the land represented by notes bearing interest at six per centum per annum; June 24, 1958, gave $100.00 to Mt. Carmel Cemetery; August 20, 1958, gave Mrs. Dovie Cashion, then Crabtree, $300.00; beginning in February 1959, correspondence and transactions relating to estate of Mrs. Belle Kahn; March 5, 1959, received and deposited in the Eudora Bank, $5,500.00, from insurance company for fire loss of the Carlton Cafe on which he had a mortgage; March 14, 1959, gave Mrs. Davie Crabtree, now Cashion, $50.00; March 24, 1959, loaned Mrs. Jewell Carlton, $6,000.00 to reopen cafe—accepted note and mortgage as security on fixtures and real estate; June 16, 1959, gave $50.00 to Hendrix College; latter part of June 1959, agreed to give the Kahn property in Louisville, Kentucky, which he had been devised by Mrs. Belle Kahn's last Will and Testament, to Children's Hospital

of Louisville, Kentucky—value $25,000.00. This gift was consumated by deed, dated July 21, 1959; procured, formulated and provided to his tax accountant detailed information for preparation of income tax report in March/June 1959; July 8, 1959, loaned Mrs. Carlton an additional $318.15, evidenced by a note and secured by the mortgage heretofore mentioned; on several occasions in several months before July 3, 1959, had conferred with Mr. Burnside; July 2, 1959, participated in drafting of his will; October 3, 1959, gave $250.00 to the Eudora Methodist Church; during the fall of 1959, collected a note from Pylate on the purchase price of the sale of his farm; attended and participated in Board of Directors Meetings of the Eudora Bank in March, April, May, June, July, August, November and December 1959, January, February and March 1960; in January 1960, was negotiating with U. S. Treasury Department concerning gift tax assessment on sister's estate; February 27, 1960, loaned Mrs. Carlton an additional $800.00. During all of the above period he was regularly loaning money to Merritt Stephenson, apparently to buy cattle, and was collecting these loans; he was also loaning other persons money; mantained a bank account and was in the Eudora Bank almost every day; went to postoffice for mail; paid taxes at courthouse; checked at the Circuit Clerk's office for records.''

It is inconceivable to me that one who engaged in these various business activities could be classed as mentally incompetent. Appellant, Mrs. Helen Short, apparently feels, because she was the only living relative, that Dr. Anderson was incompetent because he chose to leave the bulk of his estate to a friend, rather than to her. To me, this in no wise indicates incompetence. As was stated in *Bruere* v. *Mullins*, 229 Ark. 904, 320 S. W. 2d 474:

''* * * The relationship of nephew and niece to uncle is not, within itself, a particularly close relationship, nor is there evidence that would establish an unusually close connection between the parties herein.''

Here, the niece lived in Louisville, Kentucky, while Dr. Anderson, of course, lived at Eudora, and, if I read the record correctly, Mrs. Short visited Eudora during the lifetime of Dr. Anderson only *once* (in April, 1959), and she testified that he did not recognize her on that occasion.[1] Nor does the record reflect that D . Anderson made many visits to see Mrs. Short in Louisville. The last time that he visited in her home was in 1954, and he also saw her in Louisville in December, 1957, when attending the funeral of his sister. This brings to mind an interesting fact which is not mentioned in the majority opinion. The sister, Liny C. Anderson, was Dr. Anderson's only sister, and had lived in Louisville. As an heir, the doctor's share of her estate amounted to approximately $80,000, something over $70,000 after deduction of taxes. In 1958, the doctor transferred his entire portion of the estate to Mrs. Short. In my sixteen years' experience on the bench, I have never known any person to receive such an amount from an estate—and then during his or her lifetime, give the entire sum to somebody else, relative or otherwise. It is little wonder that Dr. Anderson, in his will, mentioned that he had already provided for his niece—for indeed, this had been done—and in a substantial manner.

Though, as previously pointed out, Mrs. Short testified that, on her one trip to Eudora, her uncle did not recognize her, she wrote letters or cards to him from home and from the Bahamas, the tone of which indicate that she considered herself writing to a perfectly normal person. For instance, she would comment about persons that Dr. Anderson knew, and events that he might be interested in. Only July 31, 1959, she wrote that she was going to Florida for a two weeks' vacation, and ''Have Mrs. Crabtree call me if you ever want me for anything.'' In sending a card from the Bahamas on August 10, Mrs. Short said, ''Met Mrs. Crabtree and we are having such a good time. Hope you are feeling better.   *   *   *''
One also wonders (if Mrs. Short considered Dr. Ander-

---

[1] This visit was made by appellant after being advised by Mrs. Cashion (Crabtree) that the doctor was in the hospital.

son to be incompetent in April, 1959) why there was no effort made to obtain the appointment of a guardian. It would appear, if we accept completely the testimony of appellant's witnesses as to Dr. Anderson's actions in 1958, and even as far back as 1956, that he was in need of supervision—and it seems reasonable that Mrs. Short would have been advised of these facts by her friend, Mrs. Cashion (Crabtree). Yet no steps were taken to provide a guardian.

The majority say (referring to Anderson), "The record is convincing that he was a good man, a fair-minded man; that before he became afflicted with senile psychosis, he could be counted on to do the right thing." If indeed the doctor was senile, it does not seem to have affected his generosity or his inclination to do good. I have already mentioned that he turned over the entire portion of his share of his sister's estate to Mrs. Short. The record also reflects that Mrs. Belle Kahn of Louisville, an old friend, devised her home (of the value of $25,000) in Louisville to Dr. Anderson. On July 21, 1959, the doctor conveyed this property, by deed, as a gift to the Children's Hospital of Louisville, Kentucky. He also made many other contributions, and his will likewise follows the same pattern of generosity. In that will (declared by the majority to have been executed while he was mentally incompetent) the doctor made the following bequests: $1,000 to the Methodist Church of Eudora; $1,000 to the Baptist Church of Eudora; $1,000 to the Presbyterian Church of Eudora; $1,000 to the Assembly of God Church of Eudora; $500.00 to the A.M.E. Church (colored) of Eudora; $1,000 to the Methodist Orphanage at Little Rock; $1,000 to the Crippled Children's Home of Little Rock; $1,000 to "Boys' Town" of Nebraska, and $1,000 to the Bottoms Baptist Home at Monticello.

The majority have also found that the will was procured by undue influence, but the testimony upon which this finding is based is not mentioned. The majority couple the undue influence with the lack of mental capacity, stating:

"In the case at bar, when undue influence is considered in connection with the lack of mental capacity, undoubtedly probate of the will should be set aside."

I find no testimony establishing undue influence, and evidently the majority are relying far more on the lack of mental capacity, since they do not set out testimony relied upon for the finding of duress or undue influence. Certainly, there is no sign of irrationality in the will itself. The instrument mentions friends and makes bequests to them, and contains some facts which probably only Anderson would know, and it is evident that it expresses his beneficence and philanthropic tendencies.

The Chancellor apparently listened intently to the testimony in this case, and wrote a lengthy opinion. He had the opportunity to view the witnesses, and observe their demeanor on the witness stand as they testified, an opportunity not afforded this court. I certainly cannot say that the Chancellor's findings were against the preponderance of the evidence, and I would accordingly affirm the decree.

I, therefore respectfully dissent.

Ed. F. McFaddin, Associate Justice (dissenting).

In reversing the Chancery decree, the Majority of this Court is thereby holding that the Chancellor's decision is against the preponderance of the evidence. I cannot agree with the Majority; and, therefore, I dissent.

Dr. Anderson executed his will on July 3, 1959. He died on June 15, 1960. The will was admitted to probate on June 18, 1960; and on December 21, 1960, the appellant, Mrs. Helen A. Short, filed this contest. The will having been admitted to probate, the burden was on the contestant, Mrs. Short, to prove by the preponderance of the evidence that the testator, Dr. Anderson, did not have testamentary capacity at the time he executed the will. (*Ross* v. *Edwards*, 231 Ark. 902, 333 S. W. 2d 487.)

I emphasize that the burden was on the contestant. If the testimony was equally balanced, then the Chancellor was correct in denying the contest. If the evidence did not preponderate in favor of the validity of the will, it certainly did not preponderate in favor of the invalidity of the will. With the evidence in such equal balance, we should not reverse the Chancellor, who saw the witnesses and heard them testify, whereas we see only the cold printed page.

I emphasize this point because the Majority Opinion attaches great importance to the testimony of Dr. W. P. Holman who answered a hypothetical question. It must be remembered that Dr. Holman never saw Dr. Anderson and only testified from facts detailed in the hypothetical question. I do not know how impressive Dr. Holman appeared on the witness stand: I only see the printed page. But, opposed to Dr. Holman's testimony (who never saw Dr. Anderson), there is the testimony of Dr. B. Z. Binns, who was Dr. Anderson's family physician and who saw him nearly every day; and Dr. Binns testified, based on his acquaintance and treatment, that Dr. Anderson was sane and of testamentary capacity on the day he executed the will. The Chancellor saw these two doctors testify and he took the testimony of Dr. Binns. I cannot, from the printed page, say that Dr. Binns was wrong and Dr. Holman was right.

The entire question in this case is testamentary capacity on July 3, 1959, the day of the execution of the will.[1] The number of witnesses called by the respective sides was practically even; but I propose to review the testimony now of some (not all) of the witnesses who testified that Dr. Anderson had testamentary capacity.

---

[1] The Majority Opinion says: ". . . we find by a preponderance of the evidence that the testator did not have the necessary testamentary capacity to execute a will." Again, the Majority Opinion says: ". . . a preponderance of the evidence proves that Dr. Anderson did not have the testamentary capacity required by law to execute a valid will." And in the last paragraph the Majority Opinion says: "Although appellee introduced evidence tending to prove that Dr. Anderson was mentally capable of making a valid will, we are of the opinion that the preponderance of the evidence is to the contrary."

1. Mr. O. C. Burnside, Sr. was the attorney who drew the will. He has been practicing law in Lake Village for over 45 years and knew Dr. Anderson all of these years, having represented him in numerous matters both before and after the execution of the will. Some time in the early part of 1959 Dr. Anderson explained to Mr. Burnside that Dr. Anderson had recently inherited some property in Kentucky worth approximately $100,000.00 and that he wanted to give the property to his niece (the contestant, Mrs. Helen Short). Dr. Anderson wanted to know the easiest way to transfer the property with the least expense; and Mr. Burnside advised him what to do, and it was done. Thus, six months before the execution of the will Dr. Anderson gave his niece this property. In January 1960 there was a deficiency claim of income tax by the United States government against Dr. Anderson in the amount of $821.51; and Dr. Anderson again consulted with Mr. Burnside about this matter. I mention these dates to show that Mr. Burnside was frequently consulted by Dr. Anderson: one such instance beng before the will, and one being after it. Mr. Burnside testified that some days before July 3, 1959, Dr. Anderson came to him and told him that he wanted to make a will with a combined power of attorney so that his friend, Mr. R. T. Stephenson, could sign Dr. Anderson's name to checks on the bank to look after him if he should be sick for a long time; and then could be executor of his estate when he passed away. Mr. Burnside spent some time seeing if such a "double barrel" instrument could be properly drawn. After several days Dr. Anderson saw Mr. Burnside and asked him what was his conclusion. Mr. Burnside agreed to draw the instrument, which is the will in this case. Dr. Anderson went to Mr. Burnside's office, with some notations on paper, and told him how he wanted the will drawn and just whom he wanted to be the attesting witnesses; and Mr. Burnside drew the will. Mr. Burnside testified:

"Q. At that time, and now were and are you of the opinion that the Will was an expression of Doctor Anderson's own free will?

"A.  It was, definitely.

"Q.  From your—all during your contacts with him and observations of him, did you ever, during that time, see him do, or, hear him say anything that indicated to you that he was not mentally competent?

"A.  No.

"Q.  From your associations, contacts and observations of Doctor Anderson during all of the time that you have known him in the last few years prior to the writing of this Will, do you have an opinion as to whether Dr. Anderson was mentally competent on July the 3rd, 1959?

"A.  I do.

"Q.  What is that opinion?

"A.  That he was mentally competent."

I attach great importance to this testimony. I find nothing in the record to weaken this testimony; and I attach great importance to it.

2.  One of the attesting witnesses to the will was Mrs. Mary Thach. She testified that she had known Dr. Anderson for all of her life and that this was the second will she had witnessed for him; that she could see no change in his condition on the day he signed the will from what his condition had been in preceding years; that he was perfectly normal at the time he signed the will; that his memory was all right; and that he knew what he was doing. Mrs. Thach testified that Dr. Anderson was a Director in the Eudora Bank and hardly a day passed that he did not come into the bank and she saw him nearly every day; that Dr. Anderson had previously given her the combination to his safe and told her that if anything happened to him to give the combination either to Mr. Diehl or Robert Stephenson; that since Mr. Diehl was dead she gave the combination to Robert Stephenson after Dr. Anderson's death. Now, here was a witness that had known Dr. Anderson all of her life; one who saw him nearly every day; one in whom he confided the combination to his safe. She witnessed his will and said he

was of sound mind and firm memory at the time he executed the will. That is strong testimony.

3. The next attesting witness was Miss Segis Cheairs. She worked in the store on Main Street near the bank and had known Dr. Anderson all of her life. She testified that Dr. Anderson asked her to sign the will as a witness and she signed it; and that he was of sound mind at the time he signed it; that she saw no difference in him on that day than on any other day for the several years before.

4. Mr. Frank Pylate was a farmer and ginner in Eudora and 51 years of age. He had no interest whatsoever in this litigation. He testified that he was with Dr. Anderson both before and after July 3, 1959, and that in the fall of 1958 Dr. Anderson told him: "I am going to leave my affairs in the hands of Robert Stephenson. I think he is a mighty good man." Mr. Pylate testified that from all of his various contacts, associations, and observations of Dr. Anderson, he was of the opinion that Dr. Anderson was mentally competent to make a will on July 3, 1959.

5. Miss Edith Wilson testified that she had known Dr. Anderson since January 1900; that he had been her family doctor and she saw him during the years from 1957 to 1960; that he died in her home in 1960; and that from all of her observations, associations, and acquaintance with Dr. Anderson, she considered him mentally competent on July 3, 1959.

6. Mr. W. R. Jones was the Executive Officer of the Eudora Bank. Dr. Anderson was a Director in the bank until his death. Dr. Anderson attended all the Directors' meetings in 1959 and through March 1960. In March 1959 Mr. Jones prepared papers for Dr. Anderson whereby he was making a loan of $6,000.00. Mr. Jones would see Dr. Anderson walking down the street nearly every day, and there was never a time when he thought Dr. Anderson lacked mental competency. From his knowledge, acquaintance, and association with Dr. Anderson, Mr. Jones, the Executive Oficer of the Eudora

Bank, who served on the Board of Directors with Dr. Anderson, testified that Dr. Anderson was mentally competent to make a will on July 3, 1959.

7. Reverend John T. Miles was the Methodist minister in Eudora for two years up until June 1959. Dr. Anderson was a member of his church, and Dr. Anderson was always interested in needy cases. Reverend Miles said that Dr. Anderson was "as sharp as a tack," and he considered him mentally competent in all matters.

8. Mr. S. H. Ball had lived in Eudora 41 years. He was a farmer and Constable of the township; and he testified that he saw Dr. Anderson nearly every day and from his observations and contacts he testified that Dr. Anderson was mentally competent on July 3, 1959.

9. Mr. R. C. Grubbs was a tax accountant and had lived in Eudora and known Dr. Anderson since 1922. He had handled Dr. Anderson's income tax affairs since 1941. He prepared Dr. Anderson's 1958 income tax return in 1959. Dr. Anderson had sold a farm and it took some time to refer back to his deeds and establish his cost basis; so Mr. Grubbs was with him continuously during that time. He testified that in all these transactions he never saw Dr. Anderson say or do anything that would indicate that he was mentally incompetent.

10. Mr. Ralph Scott was a business man, 52 years of age, had lived in Eudora 42 years, and was a member of the Board of Directors of the Eudora Bank, along with Dr. Anderson. He had known Dr. Anderson for over 40 years. He and Dr. Anderson regularly attended the meetings of the Board of Directors of the Bank. He testified that from all his acquaintance, contacts, and associations with Dr. Anderson, it was his opinion that Dr. Anderson was mentally competent on July 3, 1959. We copy an excerpt from his testimony:

"Q. In your opinion was he mentally competent on July the 3rd, 1959?

"A. I certainly think so, yes sir.

"Q. Was he mentally competent at that time to know the extent and nature of his property?

"A. Yes sir.

"Q. Was he mentally competent to know who might ordinarily expect to inherit from him?

"A. I am sure he was.

"Q. Was he mentally competent to know who he was putting in his will or cutting out of it?

"A. I don't think there would be any danger of any argument about that, the Doctor was about the same all the way through as far as I could tell."

11. Finally, I mention the testimony of Dr. B. Z. Binns, who had lived in Eudora since 1949, who had occasion to treat Dr. Anderson the last three years of his life, and was Dr. Anderson's family physician. He testified that from all of his contacts, observations, treatments, and experiences with Dr. Anderson, it was his firm and abiding opinion that Dr. Anderson was mentally competent to make a will on July 3, 1959. Now, here was the doctor, who was Dr. Anderson's family physician and treated him the last three years of his life, and he testified that Dr. Anderson was mentally competent to make a will on July 3, 1959.

———————

There were other witnesses, but I have selected those who knew Dr. Anderson for a number of years and had dealings with him: the lawyer who drew the will; the two attesting witnesses; the family physician; business associates; the preacher; the constable; other friends. They all testified that Dr. Anderson was mentally competent to make a will.

The fact that he was 90 years of age does not mean anything. I know several men 90 years of age who are as mentally alert as many men are at 45. I know one man past 90 who can repeat whole chapters of the Book of Acts and whole portions of Shakespeare's plays. This

Court, in *Pernot* v. *King,* 194 Ark. 896, 110 S. W. 2d 539, upheld the will of a man 92 years of age at the time of executing the will; and we said:

"Mere age is not necessarily inconsistent with testamentary capacity. 'Indeed, the mental faculties may be weakened and impaired by old age without destroying such capacity. The mere fact that an aged testator's memory is failing, or that his judgment is vacillating, or that he is becoming eccentric, or that his mind is not as active as formerly—these things do not invalidate his will if it was fairly made and he was free from undue influence. While age is not of itself a disqualification, yet it excites vigilance to see if it is accompanied with capacity.'—Thompson on Wills, § 62, pp. 88-89."

The burden of proof was on the appellant, Mrs. Helen Short, to establish a lack of testamentary capacity. The Chancellor, who saw the witnesses, held that she had failed to meet the burden. I cannot say that the Chancellor was wrong, so I dissent from the Majority Opinion in this case.